UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JASHID CHAMBERS

                    Petitioner,

        v.

LYNN LILLY

                    Respondent.

1:22-cv-4368 (NRM) (LB)

MEMORANDUM & ORDER

NINA R. MORRISON, United States District Judge:

In this action, a petition for writ of habeas corpus under 28 U.S.C. § 2254, Petitioner Jashid Chambers seeks relief from a sentence imposed after he pled guilty to attempted murder in the second degree. Petitioner alleges, among other things, that he received ineffective assistance of counsel at sentencing. For the reasons that follow, the petition is GRANTED IN PART and DENIED IN PART, and REMANDED for resentencing, as explained further below.

## OVERVIEW

In June 2014, Petitioner Jashid Chambers was convicted upon a plea of guilty to one count of attempted murder in the second degree in the Supreme Court of Kings County, New York. Three weeks later, he was sentenced to eighteen years in prison and five years of post-release supervision. The crime of conviction occurred in July 2012 when Petitioner, then twenty years old, accompanied three other men to a public park, where they acted in concert to fire numerous shots in

the park.  The bullets missed their intended target, but one struck a three-year-old bystander in the leg, injuring her.

In 2019, Petitioner moved *pro se* in the state trial court to vacate his conviction and sentence under New York Criminal Procedure Law ("N.Y. C.P.L.") § 440.  He requested, *inter alia,* that the trial court consider an array of mitigation evidence that had not been presented by his assigned trial counsel.  With the assistance of new post-conviction counsel, who argued that trial counsel's representation at sentencing had been constitutionally deficient, Petitioner achieved the rare feat of persuading the trial court to vacate its own original sentence – resulting in a modest but still significant decrease in Petitioner's term of incarceration, from eighteen to fifteen years in prison.  Respondent appealed, and the Appellate Division reversed the grant of sentencing relief, finding, in an unexplained one-sentence portion of its opinion, that Petitioner "did not show that the sentence should be set aside based on ineffective assistance of counsel." *People v. Chambers*, 158 N.Y.S.3d 250, 251 (N.Y. App. Div.  2021).

On federal habeas, this Court is presented with two principal issues to resolve.  First, the Court must decide if the instant petition was timely filed.  More specifically, it must determine whether the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1) began to run on the date in January 2017 when Petitioner's unsuccessful direct appeal of his conviction and sentence became final, or from the date in February 2022 when the parties' cross-appeals in his § 440 proceedings became final.  That question is complicated by the fact that Petitioner's

is the unusual case in which a state prisoner initially prevailed on a resentencing claim in the state trial court, lost that relief on appeal, and now seeks federal habeas review of that claim (here, ineffective assistance of counsel at sentencing). Ultimately, after considering the particulars of the factual and procedural record, Supreme Court precedent on what constitutes an intervening "final judgment" under §2244, and the reported decisions of the few courts around the nation that have been presented with analogous claims, this Court concludes that the petition is timely. The resentencing proceeding held in Kings County Supreme Court in 2019 resulted in an "intervening judgment" within the meaning of *Magwood v. Patterson*, 561 U.S. 320, 339 (2010), entitling Petitioner to a new one-year limitations period in which to seek federal habeas review. And because Petitioner filed his writ on July 5, 2023 – less than one year from the date when that intervening judgment became final – it is timely.

Second, the Court must determine whether Petitioner has shown he is entitled to relief on the merits of his claim that he received ineffective assistance of counsel at sentencing. It is well understood that on this issue, a federal habeas petitioner faces particularly steep hurdles. He must first satisfy the highly deferential standard of review that governs a court's review of trial counsel's performance under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. He must then overcome the additional deference owed to the state appellate court that rejected his federal claim, by showing that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States." § 2254(d)(1); *see also Harrington v. Richter,* 562 U.S. 86, 105 (2011) (stating that under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard").

The Court finds that Petitioner has met those heavy burdens here. In so holding, the Court is aided by an uncontested factual record showing that trial counsel did virtually no sentencing investigation or advocacy on behalf of a young client facing decades in prison on a serious attempted murder charge – despite the existence of compelling and readily available mitigation evidence. This is also a case in which the prejudice from counsel's deficient performance is indisputable, as shown by the significant impact of that very evidence on the original sentencing judge when it was finally presented in post-conviction proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Because the outcome of this case is highly fact-bound, the relevant factual and procedural history are presented in detail below.

### I.    State Court Proceedings

#### A.    Pretrial Proceedings

On July 8, 2012, the record below reflects that Jashid Chambers ("Petitioner"), along with two codefendants, Antonio McCloud and Stanley Williams (collectively, the "Defendants"), and a fourth unapprehended person, acted in concert to fire numerous shots in a public park in Brooklyn, New York. *See*

Appellant-Resp't's Br., App. Div., ECF No. 7-1 at 11[1].  The Defendants missed their target and one of their bullets instead struck a three-year-old bystander in the leg.  *Id.*  The police arrested McCloud shortly after the incident.  *Id.* at 12.  McCloud then assisted the police by helping them recover two firearms, a .380 caliber gun and a nine-millimeter gun, used in the park shooting and by implicating Petitioner.  *Id.*  According to McCloud, Petitioner provided McCloud with the .380 caliber gun that McCloud then shot in the park.  *Id.* at 13.  McCloud also reported that Petitioner fired the nine-millimeter gun in the park.  *Id.*

The record does not clearly reflect the Defendants' arrest dates, but it suggests that Petitioner was arrested sometime in 2013, approximately ten months after McCloud was arrested.  *See* Appellant-Resp't's App'x, App. Div., ECF No. 7-2 at 34.  *See also id.* at 76 (indicating Petitioner met his attorney after he was arrested in 2013).  Petitioner was charged by the Kings County District Attorney's Office (the "Respondent")[2] under Kings County Indictment Number 5909/2012 with, among other things, one count of attempted murder in the second degree (N.Y. P.L. §110.00/125.25[1]) and one count of assault in the second degree (N.Y. P.L.

---

[1]  The page numbers refer to the number assigned by ECF printed at the top of each page.

[2]  Petitioner brought this case against Lynn Lilly, the "authorized person having custody of petitioner," presumably the warden of the prison where Petitioner is in custody.  *See* Pro Se § 2254 Pet., ECF No. 1 at 1.  While Lilly is the Respondent as a technical matter, because the District Attorney of Kings County represents Lilly, prosecuted Petitioner, and later defended his conviction and sentence in state post-conviction proceedings, the Court shall refer to the Kings County District Attorney's Office as "Respondent" in this opinion.

§120.05[2]).  *Id.* at 56.  An attorney was appointed to represent Petitioner in the criminal case.  *Id.*

### B.    Plea Hearings

### i.    *Petitioner's Plea Hearing*

On June 2, 2014, the case was set for hearings and trial for Petitioner and Williams.  ECF No. 7-2 at 13.  Until that date, Petitioner had never appeared before the presiding trial court judge, Justice Joseph Gubbay of the Kings County Supreme Court  (hereinafter "the trial court").  *See* Reply Mem. of Law in Supp. of § 2254 Pet., ECF No. 20 at 23 (Ex. A).   Respondent was not ready to proceed because a necessary witness was on vacation and would not be available for approximately two weeks.  *Id.* at 14.  The trial court asked the parties about the scheduled hearings and offered to adjourn the case for two weeks.  Instead, defense counsel asked to approach the bench.  *Id.* at 14–15.

A bench conference took place off the record.  *Id.* at 15.  After the conference, the trial court announced: "D.A. wants 32 years on the case.  I'll offer him 20.  Second call."  *Id.*  In other words, the trial court offered to allow Petitioner to plead guilty to the top count, attempted murder in the second degree, and to receive a sentence of twenty years in prison.[3]

---

[3]  Attempted murder in the second degree, a class B felony under New York State law, carries a minimum sentence of five years imprisonment and a maximum sentence of twenty-five years imprisonment.  *See* ECF No. 7-2 at 69; N.Y. P.L.  § 70.02(3)(a).   Thus, since Respondent's plea offer of thirty-two years in prison exceeded the maximum sentence he could receive on the top charge alone, it appears that Respondent's offer would have required Petitioner to plead guilty to multiple charges and to serve prison sentences consecutively on those charges.

The record contains no information concerning the discussion between counsel and the trial court that preceded the plea offer.  Sometime later that day, the case was recalled.  *Id.*  The record also contains no information regarding what, if anything, took place between the first and second appearances.

The second appearance began with a statement from the trial court: "I made an offer over the People's objection.  Counts one and three to run concurrent with the sentence the defendant is currently sentenced to.  He'll have to inculpate co-defendant, Stanley Williams. Do we have a disposition?"  ECF No. 7-2 at 15.  Defense counsel then entered a guilty plea on behalf of Petitioner to attempted murder in the second degree and assault in the second degree, with sentences of imprisonment of twenty years and seven years to run concurrently to a sentence Petitioner was serving on another matter.  *Id.* at 15–16.

### ii.    *McCloud and Williams' Plea Hearings*

On May 30, 2014, McCloud also resolved his case by taking a "docket plea," *i.e.*, the defendant accepted a plea offer made directly by the trial court.  Over Respondent's objection, McCloud pled guilty to the top charge on the indictment, attempted murder in the second degree, in exchange for a promised sentence from the trial court not to exceed twelve years of imprisonment.  *See* Appellant-Resp't's Br., App. Div., ECF No. 7-1 at 17.

Almost one year after McCloud and Petitioner pled guilty, Williams resolved his case with a docket plea.  *Id.*  Williams pled guilty to attempted murder in the

second degree in exchange for a promised sentence not to exceed eight years of prison. *Id.*

Thus, although Petitioner was the youngest of the three charged Defendants and was one of two whom Responded alleged had personally fired a weapon, the plea agreement that Petitioner entered into included a maximum sentence of twenty years that was substantially higher than those of his co-defendants (whose pleas guaranteed them sentences not to exceed eight and twelve years, respectively).

### C.   Original Sentencing Hearing

Petitioner was sentenced three weeks after entry of his guilty plea, on June 23, 2014. *See* ECF No. 7-2 at 23. The record does not contain any written sentencing submission from Petitioner's counsel, and none was referenced during the sentencing hearing.

When the case was first called, the parties noted their appearances for the record and the case was immediately second-called. *Id.* at 24. It is unclear how much time elapsed between the first and second call and what, if anything, transpired in that period.

During the second call, the trial court briefly summarized the posture of the case: "This was a plea taken over the district attorney's objection . . . This is a very serious matter. A child was injured here as a result of shots being fired. It's clear that the [child] was struck accidentally without the direct intent. Nevertheless,

that was the outcome of it. You should have realized someone was going to get hurt." *Id.* The court then proceeded to sentencing.

Respondent declined to make any statements before sentencing. *Id.* at 25. Defense counsel likewise did not make any substantive statements on the record. Instead, when the trial court asked Petitioner's trial counsel if he wished to be heard on Petitioner's behalf, he said only: "Yes. As I stated at the bench, I am asking for a modification in the sentence. And at this time, Mr. Chambers would like to make a statement to the court." *Id.* Petitioner then made the following statement: "I'm sorry for the dumb decision that I made during that time. I learned my lesson from it." *Id.* Trial counsel did not offer testimony or statements from any of Petitioner's friends or family members, including those who were already present in the audience. Nor did he engage in any other advocacy on Petitioner's behalf.

Before imposing sentence, however, the trial court took it upon itself to inquire about potential mitigating factors that Petitioner's own counsel never raised at the hearing. The trial court first elicited Petitioner's age (twenty-one years old at the time of his sentencing, meaning he was nineteen or twenty years old the time of the offense two years earlier). *Id.* The trial court then noted that several members of Petitioner's family had come to court to support him and asked Petitioner to identify his mother in the audience. *Id.* The trial court continued by referencing information the court had learned from independently reviewing the pre-sentencing investigation report (the "PSI") prepared by the Probation Department. *Id.* The trial judge said, "I understand you have a child," which Petitioner confirmed. *Id.*

Relying again on the PSI, he noted that Petitioner had expressed remorse to the probation officer who interviewed him.  *Id.*

The trial court made one reference to defense counsel's advocacy: "[Y]our lawyer has been negotiating for the court to come down from the original promise in this case." *Id.* at 26.  The trial court then sentenced Petitioner to eighteen years in prison, two years less than the original sentence in the court's own offer at the earlier plea proceeding, to be followed by five years of post-release supervision.[4]  *Id.* at 27.

### D.    Petitioner's Direct Appeal

Petitioner appealed to the Appellate Division of the New York Supreme Court, arguing that his sentence of eighteen years was excessive.  *People v. Chambers*, 36 N.Y.S.3d 824 (N.Y. App. Div. 2016).  The Appellate Division affirmed the sentence by decision and order dated August 24, 2016.  *Id.*  The New York Court

---

[4]    In November 2014, the office of the Sentencing Review Coordinator, Department of Corrections and Community Supervision, sent a letter to the Kings County Supreme Court concerning an error in Petitioner's sentence to post-release supervision: New York state law authorizes a maximum of three years of post-release supervision for assault in the second degree, but Petitioner was sentenced to five years of post-release supervision.  *See* ECF No. 7-2 at 37.  The trial court adjusted Petitioner's sentence accordingly, and it did so outside his presence.  *Id.* The state court record filed with this Court does not include the letter from the office of the Sentencing Review Coordinator.  This Court similarly lacks a record of the state court proceeding in which Petitioner's sentence of post-release supervision was reduced.  *See* Appellant-Resp't's Br., App. Div., ECF No. 7-1 at 12 n.2 ("The People ordered the minutes for the November 24, 2014 resentencing from Kelly Swasey, whom the Commitment Order reflects as having been the court reporter at that proceeding, but Ms. Swasey has informed the People that she does not have any record of having transcribed that proceeding.").  However, because both parties agree that Petitioner was resentenced in this manner, the Court accepts these facts as true.

of Appeals denied Petitioner leave to appeal in an order dated October 20, 2016. *People v. Chambers*, 68 N.E.3d 107 (2016). Petitioner did not seek a writ of *certiorari* in the United States Supreme Court. *See* Pro Se § 2254 Pet., ECF No. 1 at 3.

**E.    Petitioner's State Post-Conviction Proceedings**

From prison, Petitioner filed a motion *pro se* to vacate his judgment of conviction and sentence (the "§ 440 motion"). By motion dated January 7, 2019, Petitioner moved pursuant to N.Y. C.P.L. § 440.10 and § 440.20 to set aside his conviction and sentence on the grounds, among others, that he was denied effective assistance of counsel during plea negotiations and at sentencing. *See* ECF No. 7-2 at 29.

*i.    Petitioner's Pro Se § 440 Motion*

In support of the § 440 motion, Petitioner made several arguments about mitigation evidence that, he asserted, should have merited a sentence less than the eighteen-year term he received. He noted that he was the "youngest and most impressionable" of the Defendants, who were all accused of acting in concert in the park shooting. *See id.* at 34. He also provided more detail about his upbringing that helped to contextualize his conduct in a letter that he sent to the trial court in connection with his § 440 motion. *Id.* He shared that as a youth, he suffered the "loss of his own father to gun violence, having been lured into the life of crime by others more mature and street wise, without the benefit of a father for guidance." *Id.* Petitioner continued:

Unfortunately, as a teenager I bought into the idea that I could obtain validation by showing my peers that I, too, could be courageous, feared and violent. Regretfully, this thinking led me to commit a horrible crime that turned a beautiful sunny day into a horrific nightmare in my own community and neighborhood. I lost my own father to gun violence and will forever commit my life to helping to stop this vicious cycle of destruction which is a plague upon black and brown males of this country.

Without a father in my life, I found myself looking for a replacement in the streets, as many of our youth do nowadays. I am committed to doing everything within my power to keep my own son from falling into the traps of a fatherless life. Due to the lengthy sentence I am serving, my son will be a man upon my release, having already found examples from others on what it means to be a man. I am truly ashamed of my actions; I always have been ashamed and I always will be. My failure to effectively communicate this in the past was not due to a lack of these feelings but a lack of knowing how to articulate them verbally. Today, however, I have developed better communication skills which allow me to share my feelings more clearly.

Def.-Appellant's Suppl. App'x, App. Div., ECF No. 7-4 at 2–3.

Petitioner also demonstrated remorse and insight regarding the effect of his behavior on others:

I also understand that I have not only been a part of harming the victim and the community at large, but I have also let down my dear mother who only wanted the best for me. She didn't fail me, I failed her.

Accountability allows for remorse and I take full responsibility for my actions which has allowed self reflection to commit to doing better for my family, community and for myself. When I am returned to the community, I will dedicate myself to helping to prevent gun violence.

*Id.* at 3.

In the § 440 motion, Petitioner further noted that his co-defendants received substantially lower prison sentences than he did, which he argued was unfair because he had "less experience with the criminal justice system" than them and

"his culpability was not shown to be more than any of the other two codefendants."
*See* ECF No. 7-2 at 34.  Petitioner also specifically noted that there was no evidence
that the bullet that grazed the child came from a gun he fired (as opposed to, for
example, the gun fired by McCloud), but that the trial court may have assumed that
Petitioner caused the child's injury and imposed a more severe sentence in his case
for that reason.  *Id.* at 35–36.  Indeed, contesting McCloud's version of events,
Petitioner claimed to have possessed the .380 caliber gun, not the nine-millimeter,
and stated that he fired "4 shots in the air" during the offense; it appears that
Petitioner believed that he did not fire the shot that hit the child victim in the leg
and wanted the trial court to be aware of that possibility.  *Id.* at 38.

In Petitioner's words, his trial counsel pushed him to take a plea with "a
sentence which was equal to [his] total life span on the earth," and counsel's
"hurried intent to plead this case out" made it impossible for Petitioner to "receiv[e]
a more favorable disposition."  *Id.* at 39–40.  Petitioner further argued that trial
counsel's ineffectiveness was demonstrated by, *inter alia*, "fail[ing] to represent the
interest of his client to receive a legal offer" by negotiating and pressuring him to
take a plea bargain that included an unlawful term of post-release supervision
which exceeded the statutory maximum.  *Id.* at 36.

### ii.    *Respondent's Opposition to the § 440 Motion*

Respondent argued, *inter alia*, that counsel was not ineffective for failing to
obtain a lower sentence, and that Petitioner's sentence was constitutional,

appropriate, and not excessive. *Id.* at 64–70.  Respondent did not address any of the new mitigation evidence offered by Petitioner.

### iii.   *Petitioner's Affidavit in Support of the § 440 Motion*

The trial court, presiding over the § 440 action, appointed new counsel to assist Petitioner with the § 440 motion.  *Id.* at 77.  On September 25, 2019, § 440 counsel helped Petitioner draft an affidavit concerning trial counsel's representation of Petitioner to supplement the § 440 motion.  *Id.* at 76, 78–79.  Petitioner signed the affidavit on the record after he swore to the truthfulness of the affidavit's content.  *Id.*

The affidavit contained several additional factual allegations in support of Petitioner's ineffective assistance of counsel claims.  *See id.* at 74–75.  First, in the affidavit, Petitioner alleged that during the ten-month representation, trial counsel never once visited Petitioner (who had been in custody since his arrest) to discuss the investigation, plea negotiations, potential mitigating evidence, or any other aspect of the case.  *Id.* at 74.  Petitioner alleged that he only spoke to trial counsel when he was transported to court for scheduled appearances, no more than four or five times.  *Id.*  Petitioner claimed he asked his counsel for the opportunity to review certain discovery, including a video and other forensic evidence, but that trial counsel did not provide or even discuss this evidence with him.  *Id.*  Specifically, Petitioner alleged that he asked about "DNA reports and whether the DNA of multiple individuals was found on the various firearms" seized by the police, but that trial counsel failed to provide or discuss the DNA evidence with him. *Id.*

Petitioner's affidavit reflects that on the date he entered his guilty plea, his case was scheduled for pretrial hearings, consistent with the transcript of that proceeding. *See id.* at 14, 75. But "[a]fter a brief side bar" between trial counsel and the trial court, counsel "rushed [Petitioner] to take the guilty plea." *Id* at 75. According to the affidavit, trial counsel told Petitioner "this was the best deal" and he "strongly recommended that [Petitioner] accept it." *Id.* Petitioner claimed he "asked for more time to think about the offer and discuss the case with [his] family," but that counsel told him that he had to "accept or refuse the plea offer immediately." *Id.* Petitioner stated that he had been "scared and confused." *Id.* He alleged that counsel had never "discussed the strengths and weaknesses of the People's case" with him, and "basically told [Petitioner] that [he] should take the deal," so he "reluctantly followed" his lawyer's advice. *Id.*

### iv.   *Appearances on the § 440 Motion*

On September 25, 2019, after Petitioner swore to the above affidavit, the trial court adjourned the proceeding to give Respondent an opportunity to review and respond to the new allegations in the affidavit. *Id.* at 80.

Approximately three weeks later, on October 16, 2019, the parties reconvened briefly. *Id.* at 81–83. On that date, the trial court indicated that § 440 counsel had given the court permission to have "ex parte conversations with the first assistant district attorney for the appeals bureau and other executive staff to try and facilitate a meeting . . .  at which [440 counsel] would be a principal." *Id.* at 82.

On October 29, 2019, the parties appeared again. *Id.* at 84. The trial court noted for the record that the parties conferenced the case off-the-record to get § 440 counsel "up to speed, fully up to speed on all the developments on the case." *Id.* at 85. The record does not reflect those developments, but the trial court told Petitioner that he and the lawyers were continuing to discuss "the best thing that can be done in this case," which "might be nothing." *Id.*

On November 14, 2019, the trial court held another conference on the motion. *Id.* at 87–88. The trial court indicated that Respondent would "completely oppose any reduction in sentence in this case," but stated "[t]hat's not to say that I'm without some authority here." *Id.* at 88. Speaking to Petitioner, the trial court indicated that it would consider the "horrific" details of the underlying crime and Petitioner's personal circumstances in deciding whether to vacate Petitioner's lengthy sentence, adding that based upon the record before the court thus far, "I'm struggling with what to do here." *Id.*

v.   *Respondent's Supplemental Answer to Petitioner's § 440 Motion*

A few days after the penultimate hearing on the motion, Respondent filed a supplemental response to Petitioner's motion addressing Petitioner's ineffective assistance of counsel claims (as augmented by his affidavit) for the first time. *See* ECF No. 7-2 at 90. Respondent argued that the motion to vacate the conviction was procedurally barred, that Petitioner's claims were incredible, and that the allegations regarding the circumstances of the plea did not render the plea unknowing or involuntary. *Id.* at 93–96. With respect to the claim that counsel's

performance was deficient because he failed to show or even discuss key forensic evidence with Petitioner before advising him to plead guilty, Respondent argued that the forensic evidence in question inculpated Petitioner and would not have aided his defense. *Id.* at 98–99. Respondent did not address any other allegations concerning counsel's performance. With respect to prejudice, Respondent argued that Petitioner "cannot show that he was prejudiced by counsel's alleged failure," while conceding that under New York State law, a defendant need not show prejudice in the outcome to raise this claim. *Id.* at 99. According to Respondent, the only way Petitioner could demonstrate prejudice would be to show that he would have "rejected the favorable plea offer that the court made to him" had he received effective assistance of counsel. *Id.* at 100–101.

Respondent also did not address Petitioner's claim that he received ineffective assistance of counsel at sentencing. In Respondent's supplemental answer, and in the four appearances on the § 440 motion, Respondent offered no evidence to rebut the factual assertions regarding trial counsel's performance in Petitioner's affidavit – including, but not limited to, an affirmation from trial counsel regarding the actions he took during his representation and/or the strategic reasons for his actions (or inactions). Instead, Respondent requested (in a footnote) that the trial court hold an evidentiary hearing before deciding the motion if the court was inclined to grant it. *Id.* at 101, n.1.

###### vi.     *The § 440 Decision*

Approximately one month later, on December 19, 2019, the trial court held another hearing and decided Petitioner's § 440 motion in a ruling from the bench. As in the previous appearances, the trial court conferred with the parties off the record at the beginning of the hearing. *Id.* at 6–7. After the bench conference, the case was adjourned for a second call so that § 440 counsel could confer privately with Petitioner. Following § 440 counsel's conversation with Petitioner, there was yet another off-the-record bench conference. *Id.* at 7. Nothing in the record below provides any information concerning the content of the off-the-record discussions between the trial court and the lawyers.

When the on-the-record portion of the conference began, the trial court started by asking whether Petitioner and his § 440 counsel had reviewed the minutes from the original plea hearing on June 2, 2014. *Id.* at 8. The trial court then asked whether Petitioner "[stood] by his admissions, his plea of guilty." *Id.* Petitioner affirmed, through a colloquy with the trial court, that he did "not want to challenge [his] plea at this time, meaning those admissions, those admissions of guilty." *Id.* at 9. Petitioner further affirmed that when he took the plea in 2014, he "fully understood what [he was] doing and it was what [he] wanted to do." *Id.* Based on Petitioner's statements, the trial court denied the § 440 motion insofar as it sought to have the court vacate Petitioner's guilty plea. *Id.*

The trial court then separately addressed the "aspect of the 440 motion . . . that has to do with the Court being requested to reconsider the sentence in this case." *Id.* Respondent again voiced its objection to relief from Petitioner's sentence

but did not seek to cross-examine Petitioner about his affidavit; did not present any supplemental affidavits of its own; did not call any witnesses; and did not ask the trial court make any further inquiries of Petitioner on its own. *Id.* For his part, Petitioner's § 440 counsel argued that his sentence should be reduced based on his acceptance of responsibility and remorse as demonstrated in Petitioner's § 440 submissions. *Id.* at 10. Counsel also referenced two letters, one from a nonprofit organization with which Petitioner had volunteered and one from Petitioner's mother, submitted in support of the § 440 motion. *Id.* at 10–11[5] Petitioner also spoke briefly on his own behalf, reiterating his remorse and his motivation to make better choices in the future: "I learned from all the mistakes that I made in my life so I'm trying to change my life and better myself. I can't keep making the same mistakes because I have a son and I don't want him to follow in my footsteps." *Id.* at 11.

The trial court announced that he was "granting the portion of the defendant's motion asking for reconsideration of his sentence and modifying the sentence by reducing the sentence . . . from 18 years prison . . . to 15 years prison." *Id.* at 11. Following the grant of sentencing relief, the Clerk of Court for Kings County entered an amended judgment against Petitioner dated December 19, 2019 pursuant to which he was subject to an "Amended Commitment" to the custody of the Department of Correctional Services to serve a prison term of no more than fifteen years.

---

[5] Neither letter was available to this Court as part of the record below.

**F.      The Appeals of the § 440 Decision**

Respondent appealed the § 440 decision and Petitioner cross-appealed.

*i.      Respondent's Appeal of the § 440 Decision*

Respondent first argued that although the trial court did not state the specific ground on which it granted the motion for relief from Petitioner's sentence, the circumstances suggested that it had impermissibly reduced Petitioner's sentence only "because it regretted having imposed the [original] sentence," now viewing it as "excessive." Appellant-Resp't's Br., App. Div., ECF No. 7-1 at 26–27. Respondent argued that the trial court could not have resentenced Petitioner for any reason advanced in the § 440 motion because the motion was meritless – despite the fact that Respondent framed its appeal as an appeal from a grant of a § 440.20 motion. *Id.* at 35. More specifically, Respondent argued that because a criminal defendant has "no constitutional right to a plea bargain at all," counsel cannot be required to "strike the best possible plea bargain." *Id.* at 36–39. Even if Petitioner could show that counsel's performance was deficient in failing to "secure a more favorable plea," Respondent argued that Petitioner failed to allege any cognizable prejudice because he did not claim that he would have gone to trial had he received constitutionally adequate counsel. *Id.* at 39. As in Respondent's § 440 filings in the trial court, Respondent again did not address Petitioner's claim that he received ineffective assistance of counsel in connection with his sentence.

ii.   *Petitioner's Opposition and Cross-Appeal*

Petitioner argued that his original eighteen-year prison sentence was properly set aside because (1) counsel below was "constitutionally ineffective at sentencing," and (2) his sentence was cruel and unusual in its length and disparity with his co-defendants' sentences. Def.-Appellant's Br., App. Div., ECF No. 7-3 at 9. In support of Petitioner's claim that he received ineffective assistance of counsel at sentencing, Petitioner noted that because he had agreed to plead guilty without any agreement from Respondent, "it was critical that the defense zealously advocate for the lowest sentence the court was willing to impose." *Id.* at 11.   But "counsel engaged in no on-record advocacy." *Id.*   Instead, "it was the court that marshalled the mitigation in this case," which was equally available to defense counsel, who inexplicably (and unreasonably) chose to stay silent. *Id.* at 11-12.   As to prejudice, Petitioner argued that the fact that the trial court had – at the time of Petitioner's original sentencing – imposed a sentence "two years shorter than its promise" after eliciting just several mitigating facts from Petitioner *sua sponte*, demonstrates "just how effective counsel could have been had he advocated more forcefully for a sentence that was closer to the co-defendants' and took account of Mr. Chambers' particular facts." *Id.* at 12.[6]   Petitioner cross-appealed on the ground that his

_____

[6]   The parties argued extensively in the Appellate Division concerning whether the lower court's decision to set aside Petitioner's sentence was proper under § 440.20.   The Court addresses those arguments only insofar as they relate to Petitioner's federal ineffective assistance of counsel claim and does not recite the parties' arguments concerning the scope of relief available under § 440.20, a New York State law, and whether the trial court appropriately confined itself to the boundaries of the state statute.

reduced sentence of fifteen years was excessive in light of his remorse and his youth at the time of the incident.  *Id.* at 27.

### iii.   *Respondent's Reply*

With respect to trial counsel's performance, Respondent argued that the record may not sufficiently reflect counsel's advocacy.  *See* Appellant-Resp't's Reply., App. Div., ECF No. 7-5 at 7.  In support of that hypothesis, Respondent cited the fact that at Petitioner's original sentencing, the trial court remarked that defense counsel had (at some unspecified time) asked the court to "come down" from the original promised sentence of twenty years.  Respondent further argued that "plea bargaining often takes place off the record," and speculated that counsel might have advised Petitioner to express his remorse on the record, which Petitioner ultimately did.  *Id.*  Notably, Respondent did not take the position that counsel's performance was actually not deficient, only that it *might not* have been deficient if, hypothetically, counsel had taken certain steps to advocate for his client that were not captured by the record.  At no time did Respondent argue that counsel's failure to, *inter alia,* file any written sentencing submission, present testimony from Petitioner or his family members in mitigation, make a statement in support of his client at sentencing, or engage in any other on-the-record advocacy prior to imposition of sentence were strategic omissions on trial counsel's part.

Rather than defending counsel's performance, Respondent focused its arguments on an alleged lack of prejudice.  *Id.* ("In any event, defendant failed to show that, if counsel had more zealously advocated for a lesser sentence, then there

would have been a reasonable probability that the sentencing court would have reduced the sentence even further than it did."). Respondent did not suggest that the newly presented mitigating facts concerning Petitioner's personal background, culpability relative to his co-defendants, and remorse, were previously unavailable at the original sentencing, only that the record did not show that those facts would have made a difference if they had been presented the first time around. *Id.*

### iv.   *The Appellate Division Decision*

By decision and order dated December 22, 2021, the Appellate Division denied Petitioner's claims on his cross-appeal, but granted Respondent's bid to reverse the trial court's grant of sentencing relief. *See Chambers*, 158 N.Y.S.3d 250; ECF No. 7-6. The Appellate Division understood both parties to be appealing the trial court's decision granting the "branch of the defendant's motion which was pursuant to CPL 440.20 to set aside a sentence of the same court imposed June 23, 2014 . . . as modified by an order of the same court dated November 25, 2014." *Chambers*, 158 N.Y.S.3d at 251. The panel concluded, among other things, that Petitioner "did not show that the sentence should be set aside as illegal or unauthorized" under N.Y. C.P.L. § 440.20, and that to the extent the trial court set aside the sentence as excessive, "such determination was in error, as a claim that [a] sentence is excessive may not be raised on a CPL 440.20 motion." *Id.* at 252 (internal quotation omitted). Next, the Appellate Division found that Petitioner "did not show that the sentence should be set aside based on ineffective assistance of counsel." *Id.* The Appellate Division's order thus reinstated the eighteen-year prison sentence that was originally imposed on June 23, 2014. *Id.* at 251. By order

dated February 10, 2022, Petitioner was denied leave to appeal to the New York Court of Appeals. *People v. Chambers*, 184 N.E.3d 837 (N.Y. 2022).

## II.    District Court Proceedings

### A.    Petitioner's § 2254 Petition

On July 20, 2022, Petitioner, acting *pro se,* filed the instant petition for writ of habeas corpus. *See* Pro Se § 2254 Pet. ECF No. 1.

### i.    *The Pro Se § 2254 Petition and Response*

In his *pro se* filing, Petitioner argued that the Appellate Division erred in reversing the resentencing order because he received ineffective assistance of counsel at the plea negotiation and sentencing stages. *See* Pro Se § 2254 Pet. at 5. He argued that under *Strickland*, he was prejudiced by counsel's deficient performance because "any amount of (additional) jail time has Sixth Amendment significance." *Id.* He also argued that his sentence was excessive given his youth at the time of the crime and his sincere remorse, and that his sentence was unlawfully disparate in relation to those of his codefendants. *Id.* at 7.

On August 25, 2022, the Court entered a standard order directing a response from Respondent as to why the Petition should not be granted. *See* Order to Show Cause, ECF No. 5. Respondent filed its response to the order to show cause on October 24, 2022. *See* Opp'n to Pet., ECF No. 7. Respondent argued that the Petition, which was filed on July 5, 2022, is untimely because it was filed after the end of the one-year limitations period codified in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id.* at 17–18. Specifically, Respondent

argued that Petitioner's conviction became "final" for purposes of AEDPA on January 18, 2017, when his time to file a writ of certiorari from the denial of his direct appeal expired, and his time to seek a federal writ of habeas corpus expired one year later, on January 18, 2018. *Id.* at 5.

On the merits, Respondent primarily reiterated the arguments it had advanced in the Appellate Division – that Petitioner's ineffective assistance of counsel claim fails because defendants have no constitutional right to a plea bargain, and that even if "an attorney has a Sixth Amendment duty to seek the best possible plea bargain," Petitioner has failed to demonstrate prejudice. *Id.* at 26–28. Respondent again did not address Petitioner's claim that he received ineffective assistance of counsel at sentencing. Respondent further argued that AEDPA deference applies to the instant petition because Petitioner's claims were adjudicated on the merits in state post-conviction proceedings, and that under this demanding standard of review, all of his claims fail. *Id.* at 23, 31.

On June 5, 2023, after reviewing the parties' submissions and holding an initial status conference (with Petitioner appearing *pro se*), the Court appointed counsel to represent Petitioner. *See* Order Appointing CJA Couns., ECF No. 13. With leave of the Court and without objection from Respondent, appointed counsel then filed a memorandum of law in support of the Petition, which launched a new round of full briefing. *See* Mem. of Law in Supp. of § 2254 Pet., ECF No. 16.

ii.   *Supplemental Briefing and Response*

With the benefit of counsel, Petitioner now advances several arguments on the merits and addresses Respondent's argument that the Petition is time barred. First, with respect to timeliness, Petitioner contends that he timely filed his § 2254 petition on July 5, 2022, because he filed within one year of (1) the Appellate Division's December 2021 ruling, which reversed his resentencing and reinstituted his original eighteen-year prison sentence, and (2) the New York Court of Appeals' February 10, 2022 denial of leave to appeal that ruling. *Id.* at 8, 14–15.

Petitioner argues that his sentence should be set aside because he received ineffective assistance of counsel in his plea and sentencing proceedings. *Id.* at 23– 25, 27–30. He concedes that his ineffective assistance of counsel claim was decided on the merits and that AEDPA, therefore, applies. *See id.* at 4, 26 n.96. However, Petitioner argues that the Appellate Division's decision reversing the § 440 court's sentencing reduction "does not comport with the factual record" and is therefore "not entitled to deference." *Id.* at 4, 20 ("[E]ven though the Appellate Division's unexplained, one-sentence reversal is entitled to AEDPA deference, the state appellate court can be reversed if its application of Supreme Court precedent was unreasonable."). Petitioner additionally argues that the Appellate Division either did not address the prejudice prong of his *Strickland* claim so there is "no ruling on this issue entitled to deference," or, in the alternative, the Appellate Division's "failure to contend with the uncontested record makes" its decision on prejudice "unreasonable" under AEDPA. *Id.* at 32.

With respect to proving he was prejudiced by counsel's deficient performance at plea-bargaining and sentencing, Petitioner argues that "[t]he proof is the trial court's imposition of a lower sentence following *de minimis* pro se advocacy." *Id.* at 31. Indeed, "[t]he trial court's willingness to offer a plea over the prosecution's objection – and to further reduce its sentence following the 440 Motion – underscores what effective sentencing advocacy could have accomplished." *Id.* at 32.

On August 23, 2023, Respondent filed a supplemental opposition brief. *See* Suppl. Opp'n to § 2254 Pet., ECF No. 17. As to timeliness, Respondent reasserts that this action is time barred and argues that because the Appellate Division reversed the resentencing by the lower court and itself reinstated Petitioner's original sentence without alteration, the date on which Petitioner's conviction became final remains January 18, 2017. *Id.* at 7. Additionally, Respondent now argues that Petitioner's claim that trial counsel was ineffective at plea-bargaining is unexhausted, because Petitioner withdrew his challenge to his conviction during the final § 440 hearing and abandoned it on appeal. *Id.* at 26–29. Even if Petitioner had exhausted his arguments concerning counsel's plea-bargaining performance, Respondent argues that Petitioner's allegations are not credible and the Appellate Division's decision was not contrary to, nor involved an unreasonable application of, federal law. *Id.* at 30–35.

As to trial counsel's sentencing advocacy, Respondent argues that counsel's performance was not deficient, relying heavily on the trial court's remark at the

original sentencing that counsel "ha[d] been negotiating for the court to come down from the original promise in this case" and speculating that Petitioner's brief statement of remorse at his original sentencing could have been scripted by counsel. *Id.* at 36.   In any case, Respondent argues that Petitioner was not prejudiced because "there is no indication that, at the time when defendant was initially sentenced, counsel or defendant himself could have persuaded the court to impose a sentence any lighter than the eighteen-year prison sentence that the court initially imposed." *Id.* at 37.

In a reply filed on September 6, 2023, Petitioner reiterates his timeliness arguments and includes additional documentary evidence that counsel obtained after the filing of his initial memorandum of law, in response to an earlier request to the Kings County Clerk of Court for information relating to his state court judgment(s).   These documents include a "Uniform Sentence & Commitment" form, which reflects the imposition of his amended sentence by the § 440 court in 2019, and which he offers in further support of his claim that he is being held pursuant to a new judgment that restarted the AEDPA statute of limitations.   *See* Reply Mem. of Law in Supp. of § 2254 Pet. at 2, 22.

## ANALYSIS

Petitioner seeks to set aside his sentence[7] on the ground that he received ineffective assistance of counsel during plea bargaining and sentencing which

_____

[7]   In Petitioner's *pro se* federal habeas petition, he sought to vacate his conviction and sentence.   *See* Pro Se § 2254 Pet. at 3.   However, after counsel was

caused him to receive a longer sentence than he would have with adequate representation. *See* Mem. of Law in Supp. of § 2254 Pet. at 4. Before addressing whether the limitations set forth in § 2254 apply to this petition, the Court turns to the threshold question of timeliness. Petitioner argues that his federal § 2254 petition was timely filed on July 5, 2022, which is within one year from when his judgment became final — when the New York Court of Appeals denied leave to appeal in February 2022. *See* Pro Se § 2254 Pet. Respondent counters that this action is time barred because, since the Appellate Division reversed the resentencing by the lower court and itself reinstated the original sentence without alteration, the date on which Petitioner's conviction became final remains January 18, 2017. Suppl. Opp'n to § 2254 Pet. at 10.

## III.   Potential Procedural Bars to § 2254 Relief

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") contains numerous procedural bars that preclude federal courts from reviewing the merits of claims previously adjudicated by or not presented to state courts. As is relevant here, a federal habeas court may only review timely filed § 2254 petitions raising constitutional claims that have been fully exhausted in earlier state court proceedings.

---

appointed to assist him, counsel filed substantial briefing reiterating Petitioner's claims that he received ineffective assistance of counsel with plea bargaining and sentencing, but only seeking resentencing (as opposed to vacatur of Petitioner's conviction). Based on counsel's briefing, the Court assumes Petitioner seeks only to challenge his sentence and not his conviction. In any case, as discussed *infra* Section III(B)(ii), Petitioner waived his challenge to his conviction in the § 440 proceeding and it is not properly before this Court.

Respondent argues that this Court should dismiss the petition without reaching the merits of the ineffective-assistance-of-counsel claims for two reasons. First, Respondent argues that the petition is untimely because it was not filed within one year of January 18, 2017. This date, Respondent argues, constitutes the "final judgment" for purposes of calculating the one-year limitations period under AEDPA because it marked the expiration of Petitioner's time to seek a writ of certiorari from the United States Supreme Court following the denial of his direct appeal from his 2014 conviction and sentence in the New York State courts. Petitioner counters that his petition is timely because the "judgment" pursuant to which he is currently incarcerated, and from which he now seeks habeas review, is the *amended* judgment that was entered after the December 2019 resentencing hearing in Kings County Supreme Court. That judgment, Petitioner argues, did not become final until February 10, 2022, when the New York Court of Appeals denied him leave to appeal the Appellate Division's finding that he was not entitled to relief under N.Y. C.P.L. § 440 because, *inter alia*, he did not receive ineffective assistance of counsel in his original plea and sentencing. And because he filed the instant habeas petition less than one year after the state court's amended judgment became final, Petitioner argues, his petition is timely.

Second, Respondent argues that even if the petition was timely filed, Petitioner's ineffective assistance of counsel claims are procedurally barred because he failed to exhaust those claims during his § 440 proceedings.

This Court finds that the petition is timely.  As explained more fully below, the record shows that Petitioner is presently incarcerated pursuant to an amended or "intervening" state court judgment as that term was defined in *Magwood v. Patterson*, 561 U.S. 320 (2010).  Under *Magwood* and cases applying its rule within the Second Circuit, Petitioner thus had one year from the date that the amended judgment became final (in his case, on February 10, 2022) to file a federal habeas petition challenging the constitutionality of his conviction and sentence.  Those authorities also make clear that his petition, provided it was filed within one year of the state court's amended final judgment, may also include claims related to his Sixth Amendment right to effective assistance of counsel in his *original* plea and sentencing proceedings (provided, of course, that those claims were exhausted in state post-conviction proceedings).  Petitioner readily complied with that deadline, by filing the instant petition in July 2022, less than six months after the amended judgment was final.  The petition is therefore timely.

With respect to Respondent's contention that Petitioner's constitutional claims are procedurally barred because they are unexhausted, the Court finds that Petitioner did, in fact, fully exhaust his claim that he received ineffective assistance of counsel at sentencing, and that claim is ripe for review by this Court.  On the other hand, the Court agrees with Respondent that Petitioner failed to fully exhaust his claim that his guilty plea to attempted murder in the second degree is unconstitutional because he received ineffective assistance of counsel in negotiating that plea; while Petitioner did raise such a claim in his *pro se* § 440 petition, he

abandoned that claim in his subsequent hearing in the trial court and before the Appellate Division.

## A.    Timeliness

AEDPA imposes a one-year statute of limitations on federal habeas corpus petitions filed by prisoners who challenge the state-court judgments pursuant to which they are incarcerated.  *See* § 2244(d)(1) ("A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court").  The one-year period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

§ 2244(d)(1)(A)–(D).

A state court judgment becomes "final" for the purposes of AEDPA when the "time to seek direct review in the United States Supreme Court by writ of *certiorari* expires." *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)).  Thus, the AEDPA statute of limitations period "does not begin to run until the completion of direct appellate review in the state court system and either the completion of *certiorari* proceedings in the United

States Supreme Court, or . . . the time to seek direct review via certiorari has expired." *Williams v. Artuz,* 237 F.3d at 151. A petition for a writ of *certiorari* must be filed within ninety days of the order entered by the state court of last resort. *See* Sup. Ct. R. 13(1).

The parties' dispute as to the timeliness of the present habeas petition turns on their competing claims as to when the "judgment" of conviction and sentence that Petitioner asks this Court to review became "final" within the meaning of § 2244(d)(1)(A). More specifically, if the relevant "judgment" for AEDPA purposes is (as Petitioner argues) the "Amended Commitment" reflected in the "Uniform Sentence & Judgment" that was entered following Petitioner's December 2019 resentencing in Kings County Supreme Court (Reply Mem. of Law in Supp. of § 2254 Pet. at 22) – which was then the subject of cross-appeals that finally concluded on February 10, 2022 – then the petition is timely. On the other hand, if (as Respondent argues) the fact that these state post-conviction proceedings ultimately resulted in the reinstatement of Petitioner's original eighteen-year term of incarceration means that Petitioner's judgment of conviction and sentence was in fact "final" in 2017 – when his direct appeal was denied and his time to seek certiorari from that denial expired – then his petition is untimely.

The resolution of this dispute turns on whether Petitioner is presently incarcerated pursuant to an "intervening judgment" within the meaning of *Magwood,* 561 U.S. at 339, and its progeny. In *Magwood,* the Supreme Court considered whether AEDPA procedurally barred a habeas petition brought by an

Alabama prisoner who was first sentenced to death in 1981. *Id.* at 330. Magwood
proceeded to successfully challenge his death sentence after securing a conditional
writ of habeas corpus but was again sentenced to death by the state trial court in
1986. *Id.* at 326. After unsuccessfully seeking state post-conviction relief, Magwood
filed a federal habeas petition in 1997 challenging both his original conviction and
his reimposed death sentence. In that petition, he not only asserted that his
resentencing hearing was marred by constitutional error, but also argued that
constitutional defects dating back to his *original* prosecution and trial entitled him
to habeas relief (including a claim that Alabama's post-conviction statute did not
give him "fair warning at the time of his offense that his conduct would be sufficient
to warrant a death sentence under Alabama law," *id.* at 328). The state sought to
invoke AEDPA's prohibition on "second or successive" federal habeas petitions, *see* §
2244(b), arguing, *inter alia*, that Magwood's fair-warning claim could and should
have been presented in a timely-filed habeas petition challenging his original (1981)
conviction and death sentence. *Id.* The Eleventh Circuit agreed, holding, in
relevant part, that § 2244(b) bars a petitioner who seeks habeas relief after
resentencing from challenging claims "that were or should have been presented in
the prior application" for habeas relief. *Magwood v. Culliver*, 555 F.3d 968, 975
(11th Cir. 2009). Magwood's fair-warning challenge to the constitutionality of his
death sentence, the Eleventh Circuit found, was barred as "second or successive"
(and not subject to any exceptions that allow such petitions to be considered) under
AEDPA because it involved claims that Magwood could have, but did not, raise in a

timely-filed federal habeas petition after he was *originally* sentenced to death. *Id.* at 975–976.

The Supreme Court reversed, concluding that Magwood's latest petition was not "second or successive" under § 2244(b). Instead, it was properly before the federal courts "because Magwood's habeas application *challenges a new judgment for the first time*" – namely, the judgment imposed after his 1986 resentencing hearing. *Magwood*, 561 U.S. at 323-24 (emphasis supplied). That was so even though it was undisputed that Magwood "could have raised – but did not raise" – the challenged claim(s) in his first application for habeas relief, years before he was resentenced to death. *Id.* at 336. On this point, the *Magwood* Court considered whether "abuse-of-the-writ rules, as modified by AEDPA under § 2244(b)(2), apply at all to an application challenging a new judgment." *Id.* Answering that question in the negative, the Court relied upon both AEDPA's text and history. It found significant that the statute's procedural constraints as to the timeliness and number of "applications" for habeas relief in § 2244 must be read in context – namely, with reference to § 2254(b) of the statute, which defines "applications" specifically by reference to the state-court "judgment" the petitioner seeks to challenge. *See id.* at 333 (quoting § 2254(b)'s reference to "an application for a writ of habeas corpus on behalf of a person in custody pursuant to *the judgment* of a State court," and finding that "the reference to a state-court judgment in § 2254(b) is significant because the term 'applicant' cannot be described in a vacuum") (statutory emphasis in *Magwood* opinion). Thus, when a federal court considers

whether AEDPA's prohibitions on "second or successive" petitions are applicable, the statutory language "must be interpreted with respect to the judgment challenged." *Id.* at 332-33.

Applying that logic to Magwood's case, the Supreme Court went on to find that his petition was not "second or successive" at all. *Id.* The Court found dispositive the fact that Alabama had entered an "intervening judgment" against Magwood between his first and second applications for habeas relief, and it was pursuant to the second judgment that Magwood was being held in custody. *Id.* at 339. Even though the two judgments imposed upon him the same sentence of death, they were different "judgments" nonetheless – each permitting their own "applications" for habeas relief under AEDPA. And because the petition now before the Court was "Magwood's *first* application challenging that intervening judgment[,]" it was not a "second or successive" application for relief from his death sentence within the meaning of § 2244. *Id.* (emphasis in original).

Following *Magwood,* the Second Circuit went on to consider that decision's potential application to cases involving other kinds of "amended judgments" of conviction and sentence. *Johnson v. United States,* 623 F.3d 41 (2d Cir. 2010) ("*Johnson II*"). In *Johnson II*, the habeas petitioner had successfully argued in an initial collateral attack that one of his convictions and sentences was barred by double jeopardy principles, but obtained no relief from the other convictions and sentences he was concurrently serving as a result of the original judgment against him. After Johnson's initial habeas proceedings concluded, however, the Circuit

Court "affirmed the judgment as modified," pursuant to which he continued to serve his original sentences on the remaining, undisturbed counts. *Id.* at 42-43 (citing *Johnson v. United States*, 293 Fed. Appx. 789, 790 (2d Cir. 2008). The *Johnson II* Court went on to hold that under *Magwood,* convicted prisoners who obtained an "amended judgment" after bringing a collateral attack on their original convictions and/or sentences were now entitled to bring a new application for habeas corpus relief to challenge those judgments in their entirety – even if that later-filed habeas application challenged portions of the *original* conviction and/or sentence that were wholly unamended. *Johnson II*, 623 F.3d at 44 (discussing *Magwood* and its abrogation of the Circuit's earlier precedent in *Galtieri v. United States,* 128 F.3d 33 (2d Cir. 1997)). The Court reasoned that, "[i]n light of *Magwood*, we must interpret successive applications with respect to the judgment challenged and not with respect to particular components of that judgment." *Johnson II,* 623 F.3d at 46 (emphasis supplied).

Thus, under *Johnson II*, "where a first habeas petition results in an amended judgment, a subsequent habeas petition is not successive, regardless of whether it challenges the conviction, sentence, or both." *Id.* Moreover, "[a] different result is not warranted by the fact that [a petitioner's] claims could have been raised in his prior [petition] or the fact that he effectively *challenges an unamended component of the judgment.*" *Id.* (emphasis supplied); *see also Marmolejos v. United States*, 789 F.3d 66, 70 (2015) ("*Magwood* and *Johnson II* stand for the principle that when a judgment is entered on account of new substantive proceedings involving

reconsideration of either the defendant's guilt or his appropriate punishment, it is a new judgment for purposes of AEDPA").[8]

The "amended judgment" rule of *Magwood* and *Johnson* does not necessarily require that the petitioner obtain any relief from his prison sentence to have his new AEDPA time clock run from the date of final judgment, as long as the judgment was itself amended. For example, in *Serrano v. Graham*, 14-cv-9627, 2018 U.S. Dist. LEXIS 15060 (S.D.N.Y. Jan. 29, 2018), the district court found that AEDPA did not bar a subsequent habeas petition filed after the state court imposed an amended judgment of sentence (adding a legally-mandated term of post-release supervision that had been omitted from his initial sentence), even where the resentencing hearing did nothing more than *add* an additional penalty to the petitioner's original sentence. The *Serrano* court concluded (1) that the resentencing proceeding nonetheless constituted an "intervening 'new judgment'" under *Magwood* and *Johnson*" for AEDPA purposes; and (2) this fact rendered the

---

[8] In *Marmolejos*, the Court found the petitioner's application to be "second or successive" notwithstanding the fact that after his initial habeas petition, Marmolejos filed a Rule 36 motion to correct certain clerical errors in his original judgment, which was granted in part, resulting in what was technically a new judgment – albeit one that merely corrected the spelling of his last name and his USM number. *Marmolejos*, 789 F.3d. at 68. The Second Circuit found that "an amended judgment merely correcting errors that were clerical does not constitute a 'new judgment' within the meaning of *Magwood* and *Johnson II*." *Id*. at 71. That categorization clearly does *not* describe the process that led to Petitioner's amended judgment in 2019, which involved a full resentencing hearing conducted by the trial court under N.Y. C.P.L. § 440. Instead, Petitioner's amended judgment was "entered on account of new substantive proceedings involving reconsideration of . . . his appropriate punishment," which the *Marmolejos* court recognized *does* create a "new judgment for purposes of AEDPA" in the wake of *Magwood* and *Johnson*. *Id*. at 70.

petition timely, since Serrano filed it within one year of the date that the new judgment of sentence became final, and where a petitioner "has been convicted, sentenced, and then subsequently resentenced, the AEDPA limitations period does not begin to run with respect to any part of the conviction or sentencing until the resentencing becomes final." *Id.* at *7–8 (emphasis added).

The Ninth Circuit has also applied *Magwood* when considering whether a habeas petition filed after an amended judgment was timely. *See Smith v. Williams,* 871 F.3d 684 (9th Cir. 2017). In *Smith,* the Ninth Circuit relied on *Magwood*'s interpretation as to what constitutes the operative "judgment" under AEDPA's "second or successive" rules to find that a habeas petition is timely when filed within one year of when an *amended* state court judgment becomes final – even if that amended judgment ultimately left some or all of the applicant's original conviction and sentence undisturbed. *Id.* And while not binding on this Court, the Ninth Circuit's reasoning in *Smith* is highly instructive, particularly since the Second Circuit has yet to confront a case applying *Magwood* in this specific context.

In *Smith,* the petitioner had – like Chambers – initially succeeded in a state post-conviction challenge in the trial court, only to have the appellate court reverse and instruct the trial court to "reinstate" the petitioner's original conviction and sentence. However, the state proceedings in which the petitioner originally secured relief, even though ultimately subject to reversal by the appellate court, resulted in an "Amended Judgment" (his second), albeit one that "reinstated the counts on which [he] had originally been convicted." *Id.* at 688. The Court found that Smith's

petition was clearly timely because it was the entry of this new judgment that restarted the statute of limitations for AEDPA purposes. Specifically, the *Smith* Court concluded that under *Magwood*, this one-year statute of limitations can only run from "'the date on which *the judgment*' bec[omes] final" and that judgment in this context "can only refer to the . . . judgment pursuant to which the petitioner is being held because that is the only judgment identified in the statute-of-limitations provision." *Id.* at 686–87 (emphasis in original). Thus, "[i]f the Second Amended Judgment is the judgment pursuant to which the petitioner is being held" – as it was in Smith's case – then "the petitioner is entitled to file a federal habeas petition challenging that judgment . . . within one year from the entry of that judgment." *Id.* at 688.

Since *Magwood*, it appears that the Second Circuit has not yet had occasion to decide the precise question posed here: whether a state prisoner who is being held in custody pursuant to a judgment entered after a post-conviction resentencing proceeding is entitled to a new one-year limitations period under §2244(d)(1)(A), even if he did not ultimately succeed in reducing his sentence as a result of that proceeding. Petitioner's specific claim as to timeliness under *Magwood*, *Johnson*, and (as a persuasive matter) *Smith* may not have direct precedent in this Circuit. But at its core, his argument is a straightforward one. After *Magwood*, Petitioner argues, district courts must calculate AEDPA's one-year limitations period – just as they apply § 2244(b)'s "second or successive" rule – solely by reference to the specific "judgment" pursuant to which the petitioner is being held. And because "a new

judgment gives rise to a new right to proceed in habeas . . . a new one-year statute of limitations necessarily commences" when that amended judgment becomes final. Mem. of Law in Supp. of § 2254 Pet. at 11.  Thus, Petitioner argues, since (1) the clerk's records in his case show that he is presently incarcerated pursuant to, and is challenging, an "amended" judgment that was entered by the Kings County Clerk of Court after his § 440 hearing in December 2019, and thereafter modified following the parties' cross-appeals, and (2) he filed the instant petition within one year of when that amended judgment became final in February 2022, his petition is timely.

This Court agrees.  As an initial matter, calculating the statute of limitations with reference to the specific "judgment" pursuant to which Petitioner is now being held in prison is clearly the required approach under *Magwood* and *Johnson II*. That is so even though *Magwood* and *Johnson II* were decided in the context of AEDPA's limitations on "second or successive" petitions.  Those subsections, like the limitations period of § 2244(d)(1), all reference the final "judgment" that an "applicant" for habeas relief seeks to challenge, and it is the Supreme Court's interpretation of those terms that was central to the outcome in *Magwood*.  *See Magwood*, 561 U.S. at 332-33.  (Indeed, as discussed further *infra*, though Respondent seeks to distinguish *Magwood* and *Johnson II* on their facts, arguing that Petitioner's judgment was never "amended" because the Appellate Division ultimately reversed the § 440 court's decision to reduce his sentence, it nowhere disputes that the threshold question of whether Petitioner's "judgment" was in fact "amended" in his state post-conviction proceedings is central to determining the

timeliness of his petition under §2244(d)(1).)  *See* Suppl. Opp'n to § 2254 Pet. at 11–16.

Second, *Johnson II* instructs that where a petitioner seeks to challenge an "amended judgment" of conviction and/or sentence, the district court may not dismiss the petition as procedurally barred simply because his habeas petition includes claims that challenge "an unamended component of the judgment." *Johnson II,* 623 F.3d at 46 (2d Cir. 2010).  In *Johnson II*, the Second Circuit found that the petitioner was not barred from challenging his *original* armed bank robbery and firearm convictions in the subsequently filed petition, even though those convictions and sentences were left undisturbed when the court entered an amended judgment at the conclusion of his first round of habeas litigation.  Here too, then, the fact that the Appellate Division ultimately reversed the Kings County Supreme Court's reduction of Petitioner's original sentence and reinstated an eighteen-year prison term is of no consequence under AEDPA.  The question is simply whether Petitioner is now serving that sentence pursuant to an "amended" judgment of the state court entered during his post-conviction proceedings.

The state court record clearly answers that question in the affirmative. Appended to Petitioner's reply brief is a copy of the Clerk's Record of Judgment from the Kings County Supreme Court, which the Clerk provided to his habeas counsel in response to counsel's request for (in the Clerk's notation) "judgment info." Reply Mem. of Law in Supp. of § 2254 Pet. at 17–26.  That record includes the official "Uniform Sentence & Commitment" documents signed by the Clerk of Court

reflecting the various judgments, as originally entered and amended, pursuant to which Petitioner has been held in custody at various times since his June 2014 sentencing. *Id.* at 20–22. The last of these "Uniform Sentence & Commitment" document in Petitioner's file was not completed and signed by the Clerk of Court until December 19, 2019, at the conclusion of his § 440 hearing. It "commit[s]" him to the custody of NYSDOCS in accordance with its terms, and specifically notes that this judgment constitutes an "Amended Commitment" from the one entered on his original sentencing date of June 23, 2014. *Id.* at 22.

The documents reflecting that there in fact exists an "amended" 2019 judgment of the Kings County Supreme Court pursuant to which Petitioner is now being held in DOCCS custody are dispositive of the timeliness issue here. Petitioner filed this § 2254 application within one year of the date when (in February 2022) that amended judgment became final; and this "is [his] first application challenging that intervening judgment." *Magwood,* 561 U.S. at 322. It is therefore timely.

The Court has considered Respondent's counterarguments but finds them unavailing. As an initial matter, Respondent does not dispute that if a petitioner does obtain an "amended judgment" following a resentencing hearing in state court, *Magwood* and its progeny allow that petitioner to file a new habeas petition, as long as he does so within one year of when the amended judgment becomes final. Instead, Respondent argues that Petitioner's judgment was never "amended" at all because the Appellate Division reversed the trial court's 2019 grant of post-

conviction sentencing relief.  *See* Suppl. Opp'n at 10–12.  Respondent seeks to distinguish other cases that have so applied *Magwood* by arguing, for example, that "[u]nlike in defendant's case, in *Johnson* the initial sentence had been 'amended'" (*id.* at 14); and that in *Smith,* the Ninth Circuit "held that the [statute of] limitations period for petitioning for federal habeas relief commenced" when the state court *amended* the judgment during Smith's post-conviction proceedings, and recorded the "Second Amended Judgment" on Smith's official state-court docket, which Respondent claims is a critical difference from Petitioner's case.  *Smith*, 871 F.3d at 684; Suppl. Opp'n at 14–15.  But the very distinctions upon which Respondent relies – at least, as relevant for AEDPA purposes – are negated by the "Uniform Sentence & Commitment" documents from the Clerk's Office that were appended to Petitioner's reply brief, particularly as they recorded his "Amended Commitment" in a new judgment after the 2019 resentencing hearing.  Of course, Respondent made these arguments before Petitioner obtained and filed the Clerk's record of judgment with this Court — but notably, Respondent never sought leave to file a surreply in order to address the significance of these documents or dispute Petitioner's claim that they are dispositive of the timeliness inquiry.  It appears that Respondent (understandably) has no answer to what is contained in the Clerk's record.  And in this Court's view, that record is more than sufficient to show that Petitioner obtained an "amended" judgment in 2019 and timely filed his habeas petition less than six months after that judgment became final.

Respondent also relies on several other out-of-Circuit cases to support its claim that the petition is untimely. Some of these cases predate *Magwood* and are abrogated by that intervening Supreme Court decision or, at the very least, fail to account for the question central to the outcome of *Magwood*: whether the state court entered an intervening judgment that entitles the petitioner to a new application for habeas relief under AEDPA. *See, e.g.*, *Hepburn v. Moore,* 215 F.3d 1208 (11th Cir. 2000) (cited in Suppl. Opp'n at 17); *Pelletier v. Wall*, No. 06-cv-298, 2007 WL 319991, at *3–4 (D.R.I. Jan. 30, 2007) (relying on *Hepburn* to find petition untimely after petitioner failed to obtain relief in his state court resentencing proceedings (cited in Suppl. Opp'n at 11)). The Fifth Circuit in *In re Hensley*, 836 F.3d 504 (5th Cir. 2016) (concluding that whether "new 'intervening judgment'" exists for AEDPA purposes "depends on whether a new sentence has been imposed" by the state court) and the District of Massachusetts in *Francis v. Medeiros*, 18-cv-10790, 2018 WL 5816343, at *3 (D. Mass. Nov. 6, 2018) (concluding that when a motion for a new trial was reversed on appeal and petitioner's prior judgment was reinstated, petitioner's habeas petition in fact challenged his original judgment and was therefore successive) did account for *Magwood* when finding the petitions before them were barred. But both cases have some notable distinctions from the case at bar. In *Hensley,* the Fifth Circuit concluded (after noting that the question was a "difficult" one on the "unique facts" of the case before it) that a petitioner whose earlier collateral attack on a life sentence that invalidated that judgment, but left a separate judgment with a 60-year sentence undisturbed, had not secured an

"[i]ntervening judgment" within the meaning of *Magwood*. *See* 836 F.3d at 506-07. Here, by contrast, Petitioner did secure an order of the court "amend[ing]" the judgment of the *same* sentence he now seeks to challenge on habeas. And in *Francis*, the district court relied heavily on the fact that the state trial court had stayed its resentencing order pending the Commonwealth's (successful) appeal, and no new judgment was ever entered by the state court; and since *Magwood* "presuppose[s] a new judgment," the court found that Francis did not get another opportunity to challenge his original sentence in habeas. *See Francis*, 2018 WL 5816343, at *3. By contrast, in Petitioner's state court proceedings, there was no stay of the § 440 court's ruling, and the judgment of sentence *was* amended, becoming "final" in February 2022. This is not to say that there are not some parallels in *Hensley* and *Francis* to the instant case; *Francis*, for example, also involves a petitioner who also initially succeeded in securing state post-conviction relief from his sentence, only to have that victory overturned by the state appellate court. But those decisions are not binding on this Court. Having conducted its own independent application of *Magwood* and *Johnson II* to the specific facts, state court record, and procedural posture of Petitioner's case, this Court finds that the petition is timely.

In so holding, the Court notes that its ruling, to the extent it may have any persuasive or precedential effect, only applies to the limited class of persons who, like Petitioner, (1) succeed in securing an "amended" or "intervening" judgment within the meaning of *Magwood*, and (2) file their habeas petitions within one year

of when that amended judgment becomes final.   In the fourteen years since *Magwood* was decided, it appears that similarly situated petitioners have sought to file new habeas petitions in only a handful of reported cases nationwide, and have done so with mixed success — an indication that this application of *Magwood* has been, and will remain, extremely rare.   Here, however, Petitioner's initial success on his state post-conviction resentencing claim resulted in an amended judgment, and thus afforded him one additional year to seek federal habeas review.   Because he complied with that deadline in filing the instant petition, it is timely.

## B.    Exhaustion

Even a timely federal habeas petition may be procedurally barred if the petitioner has not "exhausted the remedies available in the courts of the State."   § 2254(b)(1)(A).   Exhaustion of state remedies requires a petitioner to "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."   *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and citation omitted; alteration in original).   A petitioner must present the state courts with "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding" in order to exhaust state remedies, which requires him to "present the state courts with the same claim he urges upon the federal courts."   *Picard v. Connor*, 404 U.S. 270, 276 (1971).

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state

courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In New York, a defendant must exhaust his claims not only by presenting them to the lower state courts, but also by seeking leave to appeal any denials of relief to the New York Court of Appeals. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000).

### i.    The Parties' Arguments on Exhaustion

At the outset of these proceedings, Petitioner sought to (1) vacate his conviction (based on ineffective assistance of counsel during plea negotiations) and (2) set aside his sentence (based on ineffective assistance of counsel at sentencing). *See* Pro Se § 2254 Pet. at 3.  Through counsel, Petitioner reasserts each of these claims.  However, he now argues that if he prevails on either or both of these claims, the Court's remedy should be limited to vacatur of his sentence — *i.e.*, for the (re)imposition of a sentence that, he argues, is equivalent to one that he would have received had his trial counsel provided him effective assistance of counsel in either his plea negotiations or his sentencing advocacy.  *See* Mem. of Law in Supp. of § 2254 Pet. at 33.  Petitioner argues that counsel was deficient in two different, but inextricably intertwined, proceedings (plea-bargaining and sentencing) and that he suffered a single form of prejudice: a longer sentence than would otherwise have been imposed if counsel had not been constitutionally deficient.  *Id.* at 23–25, 27–30.

Respondent argues that Petitioner's allegations concerning counsel's performance during plea-bargaining are not exhausted and therefore cannot be

reviewed by this Court.[9]  *See* Suppl. Opp'n to § 2254 Pet. at 29.  And Respondent construes Petitioner's allegations about counsel's conduct during plea-bargaining as relevant only to "challenging [a] judgment of conviction," not the length of his sentence.  *Id.* at 27–28.

### ii.    *Petitioner's Challenge to His Conviction*

To the extent that Petitioner is challenging his conviction on the basis of trial counsel's performance during plea-bargaining, that claim was withdrawn below and is therefore not exhausted.  Petitioner did allege in his *pro se* § 440 motion that his guilty plea was the result of constitutionally ineffective assistance of trial counsel.  However, this Court agrees with Respondent that the record shows that Petitioner thereafter unequivocally withdrew his challenge to his conviction during the final hearing on the § 440 motion in a colloquy with the trial court.  After confirming that Petitioner had reviewed the minutes of his guilty plea with § 440 counsel, the trial court and Petitioner had the following exchange:

| | |
|---|---|
| THE COURT: | Mr. Chambers, it is further my understanding that you do not want to challenge your plea at this time, meaning those admissions, those admissions of guilt, and that at the time you made that plea you fully understood what you were doing and it was what you wanted to do, is that true? |
| PETITIONER: | Yes. |

*Id.* at 27.  Further, in Petitioner's cross-appeal of the § 440 decision, Petitioner challenged only the length of his amended sentence but not the § 440 court's denial

---

[9]  Respondent does not allege that Petitioner failed to exhaust his claims that counsel provided ineffective assistance during sentencing.

of relief with respect to his conviction by guilty plea.  *See* Def.-Appellant's Br., App. Div.  Because Petitioner withdrew his challenge to his conviction in the first and only state court to hear it, and failed to preserve any claim of error in his brief to the state's intermediate appellate court, he did not "present the state courts with the same claim he urges upon the federal courts," and his claim is not exhausted. *Picard*, 404 U.S. at 276.

When a habeas petitioner fails to exhaust state remedies, a federal habeas court shall consider the petitioner's claim procedurally defaulted.  *See Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).  A petitioner may only obtain relief on a procedurally defaulted claim by "demonstrating cause for the default and prejudice or by showing that he is actually innocent of the crime for which he was convicted." *Id.* (Cleaned up.)  Because there does not appear to be any cause for Petitioner's default (and Petitioner alleges none) and Petitioner does not allege actual innocence, Petitioner cannot "escape dismissal on the merits" of his challenge to his conviction.  *Id.*

### iii.    *Petitioner's Challenge to His Sentence*

Petitioner has exhausted his state remedies with respect to his challenge to his sentence.  He preserved his federal claims as to the constitutionality of his original sentence in his cross-appeal of the trial court's § 440 decision before the Appellate Division, which then reversed his resentencing; thereafter, the New York Court of Appeals denied leave to appeal that decision.  *Chambers*, 184 N.E.3d 837; *see generally Safran v. New York* No. 22-cv-3177, 2023 WL 3306932, at *2–3

(E.D.N.Y. May 6, 2023) (discussing exhaustion requirements in § 2254 petitions arising from New York prosecutions).

## IV.   Petitioner's Ineffective Assistance of Counsel Claim

This is the rare case where Petitioner has established that he received ineffective assistance of counsel in a state court proceeding that warrants federal habeas relief, even under the highly deferential standards required by AEDPA.

As set forth more fully below, the Court makes the following findings and reaches the following conclusions on the merits of this claim: (1) trial counsel's sentencing advocacy fell below an objective standard of reasonableness, and his errors and omissions were not due to any strategic considerations, much less reasonable ones; (2) Petitioner was prejudiced by trial counsel's deficient performance, which caused Petitioner to receive a longer prison sentence than he would have with the benefit of minimally adequate assistance of counsel; (3) Petitioner's claim that his trial counsel failed to provide the effective assistance of counsel guaranteed by the Sixth Amendment to the U.S. Constitution at sentencing appears to have been adjudicated on the merits by the state court (although the record is far from clear on this point), so this Court will apply AEDPA's "doubly deferential" standard of review to both prongs of the state court's denial of that claim; (4) because the state court's cursory rejection of Petitioner's ineffective assistance of counsel claim contained no explanation as to its reasons for that holding, this Court considers whether there existed any reasonable application of settled law under which the state court could have premised its ruling, and finds

none; and (5) even applying the highly deferential standards of review called for in these circumstances, Petitioner received ineffective assistance of counsel, and the state court's denial involved an unreasonable application of *Strickland v. Washington*, 466 U.S. 688 (1984), and subsequent United States Supreme Court cases applying *Strickland* in the sentencing context.

The Court will discuss the bases for each of these conclusions in turn. It begins, first, by discussing the familiar *Strickland* two-prong framework and relevant precedents in the sentencing context. Next, the Court addresses the parties' competing arguments as to whether the Appellate Division actually adjudicated both prongs of Petitioner's *Strickland* claim regarding counsel's performance at sentencing "on the merits" – a question whose outcome determines whether this Court reviews the claim *de novo* or under a more deferential standard. Finally, after concluding that the state court likely did reach the merits of both prongs of Petitioner's *Strickland* claim, this Court conducts the stringent analysis required by *Harrington v. Richter*, 562 U.S. 86 (2011), and proceeds to consider all possible bases for the Appellate Division's ruling and evaluates whether those hypothetical reasons could be deemed reasonable applications of the law to the particular facts of this case.

### A.   *Strickland*'s two-part inquiry

The Sixth Amendment guarantees criminal defendants not just the right to counsel, but the right to the "effective assistance of counsel." *See Strickland v. Washington*, 466 U.S. 668, 686. A defendant is entitled to effective assistance of

counsel at all "critical stages" of criminal proceedings, including during plea negotiations and sentencing advocacy during or after a plea hearing. *United States v. Champion*, 234 F.3d 106, 109 (2d Cir. 2000). The Supreme Court has made clear that counsel's advocacy in cases where a defendant is sentenced based on a plea agreement is subject to Sixth Amendment scrutiny and has found a right to effective assistance of counsel at sentencing in both capital and non-capital cases. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012) ("The precedents also establish that there exists a right to counsel during sentencing in both noncapital . . . and capital cases"); *Glover v. United States*, 531 U.S. 198, 204 (2001) (finding defendant sufficiently alleged *Strickland* prejudice arising from counsel's failure to contest alleged calculation error in defendant's sentencing in non-capital case).

To determine whether a defendant received the constitutionally guaranteed counsel to which he was entitled, the Supreme Court adopted a two-part test. First, a court must determine whether "counsel's representation fell below an objective standard of reasonableness" as measured by the "prevailing professional norms." *Strickland*, 466 U.S. at 687–88. If it answers that question affirmatively, the court next considers whether "there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 694. Only if a petitioner satisfies both prongs of *Strickland* is he potentially entitled to relief. *See also infra* Section V (discussing additional burden on federal habeas petitioners to show not only that *Strickland* test is met, but also that state court's application of *Strickland* was objectively unreasonable).

i.    *Strickland's Deficient Performance Prong*

When assessing counsel's conduct under the first ("deficient performance") prong of *Strickland*, a reviewing court applies a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Richter*, 562 U.S. at 104 (2011).  A reviewing court must presume that the "challenged action" or inaction by counsel "might be considered sound trial strategy" under the particular circumstances of the case.  *Strickland*, 466 U.S. at 689.  To defeat this presumption, a convicted person must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citing *Strickland*, 466 U.S. at 688).  Courts assess reasonableness not by reference to a particular set of rules governing counsel's conduct, but by considering whether counsel's conduct deviated from "prevailing professional norms." *See Strickland*, 466 U.S. at 688 (noting that "[p]revailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides."); *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (citing a New York Practice treatise and ABA standards, noting that "[n]orms of practice, reflected in national standards like the American Bar Association (ABA) Standards for Criminal Justice, are useful guides for evaluating reasonableness . . . The Supreme Court has frequently cited the ABA Standards in its decisions evaluating the constitutional sufficiency of defense counsels' investigations").

Though strategic choices "made by counsel after a thorough investigation of the facts and law are 'virtually unchallengeable,'" strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Somerville v. Conway*, 281 F. Supp. 2d 515, 519 (E.D.N.Y. 2003) (quoting *Strickland*, 446 U.S. at 690–91). "Counsel, in other words, 'has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (finding petitioner received ineffective assistance of counsel at sentencing where "counsel's investigation into [the defendant's] background did not reflect reasonable professional judgment"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (finding counsel performed deficiently by failing to sufficiently investigate defendant's case before trial for no strategic reason in a non-death penalty case); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (collecting cases from courts of appeals holding that "failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness . . . because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").

Importantly, before counsel's decision not to present mitigation evidence can be described as "tactical," counsel must have "fulfill[ed] [her] obligation to conduct a thorough investigation of the defendant's background." *Sears v. Upton*, 561 U.S. 945, 954 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). That is

because a "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case. *Sears*, U.S. 945 at 954; *Wiggins*, 593 U.S. at 533 ("'[S]trategic choices made after less than complete investigation are reasonable only to the extent that 'reasonable professional judgments support the limitations on investigation' . . . [a] decision not to investigate thus must be directly assessed for reasonableness in all the circumstances") (cleaned up).   In some cases, counsel's failure to investigate or present mitigation may reasonably be deemed tactical in hindsight by a reviewing court – in cases where, for example, the evidence a petitioner claims should have been presented was double-edged, could have opened the door to prejudicial evidence, or might have "alienate[d] the judge[.]"   *See e.g.*, *Wong v. Belmontes*, 558 U.S. 15, 22 (2009) (holding petitioner failed to establish ineffective assistance of counsel based on counsel's failure to present available mitigation evidence at sentencing where that evidence would have "triggered admission of powerful . . . evidence in rebuttal"); *Perez v. Greiner*, No. 01-cv-5522, 2002 WL 31132872, at *8 (S.D.N.Y. Sept. 25, 2002) (holding defendant failed to establish a *Strickland* claim where defendant was convicted of "two cold-blooded murders" and counsel's decision not to present insignificant available mitigation at sentencing "may have been a reasonable and competent strategy" to avoid "further alienat[ing] the judge with unsupportable and self-serving allegations that [defendant] was a 'family man'").

ii.     *Strickland's Prejudice Prong*

For an ineffective assistance of counsel claim to succeed, a convicted person must also satisfy *Strickland's* "prejudice" prong by proving that there is at least a "reasonable probability" that she was prejudiced by counsel's errors or omissions. *Strickland*, 446 U.S. at 694.   In this context, "reasonable probability" means something more than a chance that counsel's conduct had a "conceivable effect on the outcome of the proceeding." *Richter*, 562 U.S. at 104.  Importantly, however, a petitioner need *not* show that it was either certain, or even "more likely than not," that the result of the proceeding would have been different had counsel provided effective assistance.  *See Gonzalez v. United States*, 722 F.3d 118, 135 (2d Cir. 2013), *citing Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Strickland*, 466 U.S. at 649; *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).  A convicted person must instead demonstrate that but for counsel's deficient performance, there is a "substantial likelihood" that he would have obtained a "different result."  *Garner v. Lee*, 908 F.3d 845, 871 (2d Cir. 2018) (citing *Richter*, 562 U.S. at 112).  *See also Thornell v. Jones*, No. 22-982, 2024 WL 2751215, at *6 (U.S. May 30, 2024) (under *Strickland,* "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result") (internal quotations omitted).

When a convicted person brings an ineffective assistance of counsel claim arising from counsel's sentencing advocacy – including, but not limited to, sentences imposed as part of a defendant's guilty plea – he "must show a reasonable probability that, but for counsel's substandard performance, he would have received

a less severe sentence." *Gonzalez*, 722 F.3d at 130 (citing *Lafler*, 566 U.S. at 164; *Glover*, 531 U.S. at 203; *see also Whittingham v. United States*, No. 14-cv-7738, 2017 WL 2257347, at *3 (S.D.N.Y. May 22, 2017).  It is well settled that a convicted person need not show that he would have avoided incarceration altogether had he received effective assistance at sentencing, only that he would have been sentenced to a *shorter* term if he had received effective representation.  *See Lafler*, 566 U.S. at 164 (finding prejudice where the defendant showed that, but for counsel's deficient performance, there was a reasonable probability that the court would have accepted a guilty plea with a sentence less than a third of the length of the sentence he received after trial); *see also United States v. Sepling*, 944 F.3d 138, 152–53 (3d Cir. 2019) (finding defendant who received a sentence below the applicable Sentencing Guidelines range was still prejudiced by counsel's deficient performance because he "may have received an even greater variance if Sentencing Counsel" had not been ineffective).

Ultimately, whether the Court considers counsel's performance at trial, in plea negotiations, or sentencing, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Richter*, 562 U.S. at 105.   Reviewing courts must assess the adequacy of counsel's conduct not by reference to a rigid set of rules, but by considering whether counsel's conduct deviated from "prevailing professional norms."  *Strickland*, 466 U.S. at 688.  In other words, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms', not whether it deviated from

best practices or most common custom." *Richter,* 562 U.S. at 105 (*citing Strickland*, 466 U.S. at 690).

## B.     The Merits of Petitioner's Ineffective Assistance Claim

Petitioner received ineffective assistance of counsel in violation of the Sixth Amendment.    Here, counsel's failure to present compelling, readily available mitigation evidence during the plea bargaining and sentencing proceedings was a non-strategic choice that fell below "prevailing professional norms" and prejudiced Petitioner.    *Strickland*, 466 U.S. at 688.    This conclusion answers a threshold question this Court must make as part of its inquiry, but it does not resolve Petitioner's ineffective assistance claim, which still must satisfy additional requirements under AEDPA to be granted (*see* Part V, *infra*).

### i.      *Applying Strickland's Deficient Performance Prong to Petitioner's Case*

The Court begins its examination of whether counsel provided constitutionally adequate representation in his sentencing advocacy by considering the "prevailing professional norms" that were in place at the time.    *Id.*   In 2013 and 2014, when counsel represented Petitioner, the third edition of the Standards for Criminal Justice Prosecution Function and Defense Function issued by the American Bar Association memorialized important norms for criminal defense practitioners (the "ABA Standards").    *See* ABA Standards for Criminal Justice

Prosecution Function and Defense Function Standard (3d ed. 1993).[10,11] Section 4-8.1 of the ABA Standards described the expectations for defense counsel in sentencing.  According to the ABA Standards:

> Defense counsel should present to the court any ground which will assist in reaching a proper disposition favorable to the accused. If a presentence report or summary is made available to defense counsel, he or she should seek to verify the information contained in it and should be prepared to supplement or challenge it if necessary. If there is no presentence report or if it is not disclosed, defense counsel should submit to the court and the prosecutor all favorable information relevant to sentencing and in an appropriate case, with the consent of the accused, be prepared to suggest a program of rehabilitation based on defense counsel's exploration of employment, educational, and other opportunities made available by community services.

*Id.*  The ABA Standards had been in place for more than twenty years before Petitioner was sentenced.  *Id.*

Similarly, the Performance Guidelines for Criminal Defense Representation promulgated by the National Legal Aid & Defender Association (the "Performance Guidelines") describe "counsel's obligations in the sentencing process" as, among other things, "to ensure all reasonably available mitigating and favorable information, which is likely to benefit the client, is presented to the court." *See* Performance Guidelines for Criminal Defense Representation, National Legal Aid & Defender Association (4d ed. 2006), available at https://www.nlada.org/defender-

---

[10]  The third edition of the Standards is available online.  *See e.g.*, https://dids.nv.gov/uploadedFiles/didsnvgov/content/Resources/ABAStandardsforthe DefenseFunction(1).pdf

[11]  The American Bar Association did not issue the next edition of the Standards for Criminal Justice Prosecution Function and Defense Function until the Fourth edition was published in 2015.  Since this edition post-dated trial counsel's representation of Petitioner, the Court does not consider them.

standards/performance-guidelines/black-letter (emphasis supplied). The
Performance Guidelines describe additional important obligations for defense
counsel in preparing for sentencing, including "maintain[ing] regular contact with
the client prior to the sentencing hearing," "obtain[ing] from the client relevant
information concerning such subjects as his or her background and personal history,
prior criminal record, employment history and skills, education, medical history and
condition, and financial status, and obtain[ing] from the client sources through
which the information provided can be corroborated," and "collect[ing] documents
and affidavits to support the defense position, and where relevant, prepar[ing]
witnesses to testify at the sentencing hearing." *Id.* at Guideline 8.3: Preparation for
Sentencing.  None of these obligations were fulfilled here.

Analyzing the record in light of these authorities and minimum standards,
this Court readily concludes that Petitioner received ineffective assistance of
counsel at sentencing in violation of the Sixth Amendment.  Trial counsel's failure
to present the sentencing court with compelling, available mitigation evidence prior
to or at Petitioner's final sentencing hearing was a non-strategic choice that fell far
below "prevailing professional norms." *Strickland*, 466 U.S. at 688.

In conducting this assessment, even though Petitioner has waived his
challenge to the underlying guilty plea (*see* Section IIIB(ii) *supra*) the Court gives
trial counsel the benefit of the entire record, including both the June 2, 2014 plea
hearing and the June 23, 2014 sentencing hearing.  The eighteen-year prison
sentence imposed by the trial court at the sentencing hearing arose from a plea

agreement reached three weeks earlier between the trial court and Petitioner; it specified that Petitioner would receive a maximum sentence of twenty years in prison if he pled guilty to attempted murder in the second degree. Thus, the Court takes the record of the plea proceeding into account in order to afford trial counsel every favorable inference that might be drawn with respect to any efforts he may have made that contributed to Petitioner's ultimate eighteen-year sentence.

The Court reviews the available record regarding each phase of the proceedings in turn.

With respect to the plea hearing itself, the record reflects that the first (and only) time Petitioner's counsel approached the trial court about resolving the case with a plea agreement was the same day Petitioner ultimately pleaded guilty.[12] The only advocacy trial counsel engaged in before negotiating the plea agreement with the promised twenty-year prison sentence was a single conversation at the bench. Before approaching the bench, counsel said nothing on the record regarding a possible plea bargain and the record contains no written submissions (such as a pre-pleading memorandum or letter brief) requesting a plea bargain from the trial court. Although the record does not reflect the length of the bench conference, the conference was not long enough to require the trial court to adjourn any other pending matters or to ask the parties to meet in chambers, as might ordinarily

---

[12]  Petitioner first appeared in front of Justice Gubbay on June 2, 2014, the same day he pleaded guilty. *See* Reply Mem. of Law in Supp. of § 2254 Pet. at 23 Ex. A (recording Petitioner's court appearances after arraignment on the indictment and showing that he first appeared in front of Justice Gubbay on June 2, 2014).

happen when the parties need to have a longer off-the-record conversation. Immediately after the bench conference, the trial court stated: the "DA wants 32 years on the case. I'll offer him 20." *See* ECF No. 7-2 at 15.

Petitioner's uncontested affidavit[13] establishes that counsel urged Petitioner in the strongest possible terms to agree to the trial court's offer of a twenty-year sentence right after it was extended to him. *See id*. at 74. Counsel told Petitioner

---

[13]   In considering Petitioner's affidavit, the Court notes that Respondent presented *no* evidence to counter his specific factual assertions about trial counsel's performance or communications with his client in any written submission. Nor did it do so in any of the five appearances before the trial court on Petitioner's § 440 motion. Respondent offers no explanation for its failure to controvert Petitioner's allegations, instead asserting that Respondent was "not required to file an affidavit from [trial] counsel." Suppl. Opp'n to § 2254 Pet.at 33. In its defense, Respondent notes that "sometimes" plea counsel asserts attorney-client privilege (until a hearing is ordered), has no recollection or an insufficient recollection of events, or "might be tempted to be less than candid" to assist a former client. *Id.*

Here, the record reflects that the trial court afforded Respondent repeated opportunities to investigate and counter the highly specific allegations in Petitioner's § 440 motion, letters to the court, and supplemental affidavit before issuing its ruling. Yet Respondent presented no evidence from either trial counsel or the trial prosecutor (who was similarly present for all of the plea and sentencing proceedings where the off-the-record advocacy Respondent relies upon took place) to dispute or justify counsel's on-the-record advocacy efforts. The original plea and sentencing proceedings took place just a few years before the § 440 hearing and involved a young defendant who faced extremely serious charges and potentially decades in prison if convicted of causing injuries to a young child. This Court will not speculate that trial counsel simply failed to recall the relevant facts and circumstances of this case or could not meaningfully refresh his recollection from the case records, absent affirmative evidence to support that conclusion. Similarly, since it is well established that raising a claim of ineffective assistance of counsel broadly waives attorney-client privilege as to relevant communications and counsel's strategic choices, *see, e.g., Aladino v. United States,* No. 09-cv-926, 2011 WL 6131175, at *2 (E.D.N.Y. Dec. 8, 2011) (*citing United States v. Pinson*, 584 F.3d 972, 977–78 (10th Cir. 2009)), absent any evidence that trial counsel actually declined to speak with Respondent about his representation of Petitioner on grounds of attorney-client privilege, the Court declines to make such an assumption.

that the twenty-year plea was the "best deal" and "strongly recommended" that he accept it.  *Id.* at 75.  While it is true that Respondent's "offer" at the time was thirty-two years, Respondent must have arrived at that offer by proposing that Petitioner serve the maximum sentence of twenty-five years on the top count consecutive to a sentence of seven years on a lesser count.  The court's offer was just five years less than the maximum possible sentence on the top charge.

Counsel also told Petitioner it was an exploding offer – that he had to "accept or refuse the plea offer immediately."  *Id.*  But the record and the posture of the case belie counsel's claim that Petitioner had to accept or lose the plea.  When the trial court extended the offer, it did so without suggesting there was any time frame in which Petitioner had to accept the plea.  *Id.* at 13–22.  There was no possibility that the parties could move forward to pretrial hearings on that date because Respondent indicated it would not be ready to begin hearings for at least another two weeks.  And Petitioner would have appeared in front of the trial court again at a subsequent court date if the case had been adjourned as the trial court suggested.  In other words, there is no reason to credit counsel's claim that Petitioner had to accept the offer the same day it was made or risk losing the chance to accept it later.

In sum, even when giving trial counsel the benefit of all advocacy he may have done to convince the trial court to offer Petitioner a lower sentence during plea negotiations, that advocacy was virtually non-existent.  It consisted only of (at most) a single, brief, off-the-record conversation with a judge who had no previous familiarity with the case.  And, based on the trial court's later questions to

Petitioner at sentencing, it appears clear that counsel did not even provide the trial court with the most basic information about Petitioner before negotiating a decades-long prison sentence. There is also no evidence on record that in that single, brief bench conference counsel invoked any of the available mitigation that the trial court would *sua sponte* elicit from a direct colloquy with Petitioner himself at sentencing three weeks later – much less any of the even more compelling, equally available evidence that Petitioner and his § 440 counsel would newly present to the trial court five years later.

Counsel's performance was equally, if not more, deficient at the later sentencing proceeding. Critically, unlike an agreed-upon plea bargain with the government where the length of a defendant's sentence might be dictated by the terms of the plea agreement, in Petitioner's case, the trial court had total discretion to reduce the sentence it had promised to Petitioner as part of his docket plea. But in the three weeks that elapsed between the plea and sentencing proceedings, counsel did exactly nothing. Counsel did not make a written submission advocating for a lower sentence. He did not obtain and present any mitigation evidence like school records, medical records, or social service records. He did not inform the trial court that Petitioner had lost his own father to gun violence as a child – a defining tragedy in this twenty-one-year old's life that would not only have been compelling mitigation in its own right, but would have gone a long way towards explaining why Petitioner found himself drawn to (in his words) "replacement" father figures "in the streets," including men who drew him further into a cycle of violence. He did not

arrange for any family members or friends to speak on Petitioner's behalf at his sentencing, even though family and friends attended the sentencing.  He did not obtain any letters of support on Petitioner's behalf – not even from Petitioner's mother, who was present for every proceeding reflected in the record during the ten months Petitioner was in custody and who provided a letter in support of the later § 440 motion.

Even during the sentencing proceeding, where trial counsel was given the opportunity to make arguments on Petitioner's behalf in front of a judge who was obviously amenable to reducing the promised sentence, counsel still did next to nothing.  When trial counsel was given a chance to speak, he said only: "As I stated at the bench, I am asking for a modification in the sentence.  And, at this time, Mr. Chambers would like to make a statement to the court."  *Id*. at 25.  Trial counsel said nothing – not even an on-the-record reiteration of whatever he may have stated at the bench earlier that day.  Indeed, based on the hearing record itself, counsel's statement at the bench apparently did not include even the few basic facts in mitigation that were briefly documented in the PSI.  Instead, it was the trial court that took the time to inquire into some of the PSI's most salient facts in a separate colloquy with Petitioner.

The trial court asked Petitioner about his age (twenty-one at sentencing) and about his young child, two facts that counsel had apparently not brought to the trial court's attention when negotiating the plea bargain and in the conversation at the bench before sentencing.  *Id*.  The trial court observed that Petitioner had

significant family support, noting that his "whole family was in court" earlier in the day and asking Petitioner to identify his remaining family member in the audience (his mother). *Id.* The trial court also read the PSI report authored by Probation and noted Petitioner's expressions of remorse to probation. *Id.* Having done all of counsel's work on its own, the trial court then reduced the promised sentence by two years, sentencing Petitioner to eighteen years in prison. *Id.* at 26. From start to finish – including the trial court's recitation of ancillary terms of Petitioner's sentence such as mandatory fines, DNA collection, and orders of protection – the transcript of Petitioner's entire sentencing hearing spans only four pages. *See id.* at 24–28.

The only indication that trial counsel made any effort whatsoever to advocate for a sentence of less than the trial court's promised maximum of twenty years was his statement that he was asking the trial court to impose a shorter term as he had "stated at the bench," and the trial court's brief comment that "your lawyer has been negotiating for the court to come down from the original promise in this case." *Id.* at 26. Both of those remarks appear to allude to the same off-the-record conversation at the bench that took place right before sentencing. There is no evidence that counsel's "negotiat[ion]" at the bench involved anything beyond a *pro forma* request that the trial court consider imposing a lesser sentence, without giving the trial court any actual reason to do so.

Moreover, the trial court's reaction to the mitigation evidence that Petitioner later presented in his *pro se* § 440 motion demonstrates that counsel did not take

basic steps to investigate and present that same evidence, the vast majority of which was equally available at the time of the original sentencing, to a judge who was later persuaded to reduce Petitioner's sentence by three additional years because of it. In particular, as Petitioner later told the trial court in his *pro se* filing from prison, Petitioner's early life was marked by violence and traumatic loss which led, in substantial part, to his involvement in the criminal conduct at issue. Petitioner lost his father to gun violence as a child. Without a father in his life, he "found [himself] looking for a replacement in the streets" and "bought into the idea that [he] could obtain validation by showing [his] peers that [he], too, could be courageous, feared and violent." ECF No. 7-4 at 2. As Petitioner acknowledged, "this thinking led [him] to commit a horrible crime." *Id.* He expressed genuine concern that his own son would have to find "examples from others on what it means to be a man" because of how much of his son's life he would miss behind bars and his fervent hope that his son finds better examples than he did. *Id.* He also demonstrated insight and took full responsibility for his actions. "I am truly ashamed of my actions; I always have been ashamed and I always will be . . . I also understand that I have not only been a part of harming the victim and the community at large, but I have also let down my dear mother who only wanted the best for me. She didn't fail me. I failed her." *Id.* at 2–3.

When this evidence was finally before the trial court during the § 440 hearing – after duly considering it alongside the indisputably serious nature of the crime, including the non-fatal injuries to the innocent child bystander at the scene – the

trial court vacated the sentence it had originally imposed and reduced Petitioner's prison term to fifteen years.  Notably, the vast majority of the information that proved so significant to the trial court (that is, all except for Petitioner's record of good behavior and community service in prison) was equally available to be marshaled by a capable advocate at the time of the original sentencing.

Trial counsel's sentencing advocacy fell far below professional norms for criminal defense lawyers, particularly those representing clients charged with serious felonies and whose potential exposure at sentencing may be decades of prison.  The ABA Standards for sentencing advocacy had been in place for more than twenty years before Petitioner was sentenced.  Yet trial counsel failed to follow their most fundamental tenets, including, *inter alia,* failing to either "verify" or "supplement" basic information about Petitioner's background and current circumstances contained in the PSI in order to present it at sentencing on Petitioner's behalf.  Not only was counsel's conduct "far from exemplary," here the record reveals that "counsel took an approach that no competent lawyer would have chosen" – doing virtually nothing. *Dunn v. Reeves*, 594 U.S. 731, 739, (2021).

In essence, counsel did "little more than simply attend [Petitioner's] sentencing hearing," which is far from "enough to satisfy the constitutional command." *Gonzalez*, 722 F.3d at 136 (applying *Strickland* to hold that defendant received ineffective assistance of counsel at sentencing after negotiating a guilty plea and remanding for resentencing).  The Second Circuit's application of

*Strickland* and its progeny to grant sentencing relief under 28 U.S.C. § 2255 in *Gonzalez* is particularly instructive here.[14]

In *Gonzalez*, the habeas petitioner pled guilty to a series of narcotics and bribery crimes and was sentenced to 210 months in prison (*i.e.,* just under eighteen years). Gonzalez filed a § 2255 petition that included a detailed affidavit from the petitioner himself, detailing trial counsel's failures to communicate with him, prepare for sentencing, or otherwise advocate for a lower sentence on his behalf. Upon review of the entire record, the Second Circuit concluded that counsel's sentencing advocacy violated *Strickland* and that Gonzalez had also demonstrated a reasonable likelihood of prejudice. And the Court reached that conclusion even though the ultimate sentence Gonzalez received was below the lower end of the sentencing guideline range (262 to 327 months) estimated by the Government at the original plea hearing, and was at the very bottom of the range (210 to 262 months) ultimately calculated in the presentence investigation report ("PSR") and adopted by the district court. *Id.* at 123–24. As detailed in the opinion, the Second Circuit catalogued counsel's omissions including, *inter alia,* evidence that trial counsel did not visit his incarcerated client for nearly eleven months; did not accompany his

---

[14] The Court notes that *Gonzalez* concerned a habeas petition under § 2255 which was reviewed *de novo* by the district court, as opposed to the petition in this case, which is brought under § 2254 and, as discussed *supra* (Section III), must be reviewed with greater deference. However, "[e]ven under *de novo* review, the standard for judging [claims concerning] counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Thus, the Second Circuit's conclusion in *Gonzalez* is important to this Court's assessment of the merits of Petitioner's claims and still relevant to the Court's later analysis of Petitioner's claims under AEDPA (*see* Section V, *infra*).

client to his interview by the Probation Department; was not reachable by Gonzalez in advance of sentencing; "spent no more than 15 minutes with defendant discussing the PSR"; failed to submit a sentencing memorandum to the court; and failed to seek any sentencing leniency or a downward departure based on other facts (such as defendant's role in the offense and his cooperation with the government) that were readily available to him.  *See id.* at 135.  Instead, trial counsel delivered only a perfunctory "two-sentence statement . . . urging that the court order imprisonment at the low end of the Guidelines range," followed by a longer statement from his client.  *Id.* at 124.  On this record, the Second Circuit readily concluded, first, that trial counsel's sentencing advocacy constituted deficient performance and second, that the "potentially 'effective' arguments" on Gonzalez's behalf that could have persuaded the trial court to further reduce the length of his sentence were sufficient to show *Strickland* prejudice.  *Id.* at 135–36.

The factual parallels between this case and *Gonzalez* are notable.  Here, too, trial counsel spoke to Petitioner only a handful of times over the nearly-year-long representation prior to sentencing, even though his young client was facing potential decades in prison.   Counsel's communications with Petitioner were similarly limited to brief encounters at court appearances, never once visiting him in jail.  Counsel did not discuss the PSI with Petitioner until the day of Petitioner's sentencing.  Counsel "failed to submit to the court a sentencing memorandum" on his client's behalf.  *Id.* at 135.  Counsel also "failed to seek any sentencing leniency" despite low-hanging fruit that was either apparent in the PSI or would have been

readily available to counsel had he made even basic inquiries into his client's personal history or current circumstances. *Id*. These included, *inter alia,* Petitioner's youth, his role as a young father to a newborn, his family support, his remorse, his unequivocal acceptance of responsibility, and the traumatic early loss of his father to gun violence that contextualized, in significant part, his involvement in the offense. Given these undisputed facts, this Court has no difficulty concluding that Petitioner received constitutionally inadequate representation at sentencing.

In reaching this conclusion, the Court has determined there is no potential "strategic" or "tactical" explanation for counsel's performance for two reasons. *See Strickland*, 466 U.S. at 681 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment"); *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) ("Actions or omissions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance"). First, there is simply no factual predicate on this record for this Court to make a finding that counsel's omissions at sentencing here were strategic ones. That is because Respondent (despite being afforded multiple adjournments by the § 440 court to give it time to investigate the merits of Petitioner's ineffective assistance of counsel claims) declined to present any evidence from trial counsel to justify his conduct. Respondent did not file an affidavit from trial counsel; did not provide the court with any communications or other records from his file

reconstructing his investigation or contemporaneous communications with his client; and did not call him to testify at the § 440 hearing.  Each of those options were available to Respondent if trial counsel in fact had strategic considerations that justified his conduct for the § 440 court to consider.

Second, while in some circumstances counsel may intentionally abstain from investigating or presenting mitigation evidence out of concern that it might put the defendant in a worse position at sentencing (*see infra* Section IV(A)(i)), no such concerns apply here.  The mitigation evidence that counsel failed to present in support of a lesser sentence was extremely compelling biographical information, which served the dual function of (1) invoking traditional mitigating factors (Petitioner's youth, supportive family, and caretaking responsibilities for his young son) and (2) placing his criminal offense into necessary context – particularly the early loss of his father to gun violence and his ensuing misguided search for a father figure that led him ultimately to his older co-defendants.  Trial counsel also failed to present anything approximating the compelling case later made to the trial court in the § 440 proceedings regarding Petitioner's profound shame and remorse for the harm he caused the injured child victim, the victim's family, his own family, and the community.  There was no conceivable downside to presenting this information and, as evidenced by the trial court's decision to reduce Petitioner's sentence by a total of five years after learning the information, there was extraordinary upside.  Either trial counsel failed to make even the most cursory investigation into available mitigation evidence, like basic facts about his client's past and present life, or

counsel was aware of the mitigation evidence later presented and chose, for no strategic reason, not to present it either while negotiating a promised sentence in plea-bargaining or during the sentencing proceeding. *See Cox v. Donnelly*, 387 F.3d 193, 199 (2d Cir. 2004) (finding "implausible the state's suggestion that counsel's silence was a deliberate tactic" where counsel failed to object to multiple unconstitutional jury instructions and concluding that "in the absence of any reasonable explanation by Cox's counsel for his actions, we must conclude that his failure to object to the unconstitutional instruction led to representation that fell below the prevailing norms of the legal profession and that his performance was objectively unreasonable.").

### ii. *Applying Strickland's Prejudice Prong to Petitioner's Case*

It is also readily apparent that there is, at the very least, a "reasonable probability" that Petitioner was prejudiced by counsel's conduct, as that test has been applied and understood for decades since *Strickland*. *See Cox,* 387 F.3d at 135–36 (citing*, inter alia*, *Strickland*, 466 U.S. at 694). As noted *supra*, there is ample Supreme Court precedent holding that where there exists a reasonable likelihood that the petitioner received an additional period of incarceration due to counsel's errors, the prejudice prong of *Strickland* is satisfied. *See., e.g.*, *Lafler*, 566 U.S. at 165; *Glover*, 531 U.S. at 203–04. Here, the very same trial court that initially offered Petitioner a twenty-year term of incarceration (i) was immediately persuaded to reduce that sentence by two years when he learned and confirmed, *sua sponte*, just a few mitigating facts about Petitioner's life set forth in the PSI, and then (ii) during the § 440 proceedings, vacated the original sentence and reduced it

by another three years after learning an even broader array of mitigating evidence that was readily available to but never presented by trial counsel.

It is true that many ineffective assistance of counsel claims at sentencing fail because a reviewing court concludes that there is little chance the sentencing court would have imposed a more lenient sentence even with better advocacy.  *See e.g.*, *Perez v. Conway*, No. 09-cv-5173, 2011 WL 1044607, at *7 (S.D.N.Y. Mar. 18, 2011) (holding no prejudice for counsel's failure to repeat mitigation information at sentencing because sentencing judge was "already familiar with all the evidence counsel could have repeated" and petitioner does not allege that counsel "failed to uncover" additional "evidence that might be construed as mitigating").  But here, there was no conceivable downside, and a demonstrated upside, to presenting this information to the trial court.  Trial counsel's failure to do so thus prejudiced Petitioner and resulted in the imposition of a sentence longer than the one he would otherwise have received.  Indeed, in practical terms, particularly when factoring in Petitioner's eligibility for parole, trial counsel's deficient performance at sentencing could well have made the difference in whether Petitioner will be released from prison before his son reaches adulthood.  Ultimately, whatever Petitioner's eventual release date may be, it is clear that counsel's failure to adhere to basic professional norms in his sentencing investigation and advocacy created, at the very least, a "reasonable probability" that Petitioner was sentenced to a longer term of imprisonment than he would have faced with adequate assistance of counsel. *Strickland*, 446 U.S. at 694

## V.  Application of AEDPA to Petitioner's Ineffective Assistance of Counsel Claim

Even a petitioner who establishes a constitutional violation may fail to clear the bars to relief codified in § 2254.  *See Cox*, 387 F.3d at 200 ("Although we have found that Cox likely meets both prongs of the *Strickland* test, his habeas petition can only be granted if the state courts' decision that he did not receive ineffective assistance of counsel represents an 'unreasonable,' not simply incorrect or erroneous, application of federal law.").  Pursuant to § 2254, as amended by AEDPA, a habeas court considering a claim that was decided on the merits in a state court proceeding may grant relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

For claims adjudicated on the merits, AEDPA establishes a highly deferential standard of review.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.  The requirements set forth by AEDPA are strictly construed and, by design, erect a substantial barrier to federal habeas relief.  These rules are founded upon the principle that "[s]tate courts are adequate forums for the vindication of federal rights" and are "presumptively competent[ ] to adjudicate claims arising under the

laws of the United States." *Burt v. Titlow*, 571 U.S. 12, 19 (2013) (internal quotation marks and citation omitted).

By contrast, for a claim made in a federal habeas petition that was not adjudicated on the merits in state court, "AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*." *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (internal quotation omitted).

## A. Whether the State Court Denied Petitioner's *Strickland* Claim on the Merits

As an initial matter, the Court must determine whether the Appellate Division adjudicated Petitioner's claim that he received ineffective assistance of counsel at sentencing in violation of the Sixth Amendment "on the merits," triggering AEDPA's deferential standard of review.

The answer here is far from clear. The Appellate Division resolved Petitioner's ineffective assistance of counsel claim in one sentence, holding that Petitioner "did not show that the sentence should be set aside based on ineffective assistance of counsel." *People v. Chambers*, 158 N.Y.S.3d 250, 251 (N.Y. App. Div. 2021). Respondent argues that this summary disposition, while unexplained, nonetheless constitutes a decision on the merits as that term has been understood and applied by Supreme Court precedent. *See* Mem. of Law in Supp. of § 2254 Pet. at 4. Petitioner argues the opposite; in the alternative, he argues that the Appellate Division's ruling should be construed, at most, as a denial on the merits of only *Strickland*'s deficient-performance prong, *id.* at 23, but that the Appellate Division

never reached the prejudice prong of *Strickland* and that the Court should at least give that element of his claim a *de novo* review. *Id.* at 31–32.

Complicating the resolution of this question is the fact that the Appellate Division cited only two New York state cases in support of its ruling. These cases each rejected ineffective assistance of counsel claims brought after defendants pled guilty, but do not themselves cite *Strickland* or any federal constitutional caselaw. *See* App. Div. Decision, ECF No. 7-6 (citing *People v. Parker*, 148 N.Y.S.3d 387, 388 (N.Y. App. Div. 2021) (holding that defendant failed to "demonstrate the absence of strategic or other legitimate explanations for counsel's [alleged shortcomings]"); and *People v. Johnson*, 896 N.Y.S.2d 878, 879 (2010) (holding that defendant "failed to establish that he was deprived of the effective assistance of counsel with respect to his plea of guilty. . . . [A]nd nothing in the record casts doubt on the defense counsel's effectiveness")). Nor do either of the New York state cases cited by the Appellate Division address *Strickland*'s prejudice prong. Moreover, New York has its own state constitutional claim for ineffective assistance of counsel, which provides more expansive protections than its federal analogue and does not (unlike *Strickland*) require a convicted person to prove that she was prejudiced by counsel's ineffectiveness. *See Henry*, 409 F.3d at 69 (quoting *People v. Benevento*, 697 N.E.2d 584, 588 (N.Y. 1998)) (noting that the New York test is "ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" and that "whether defendant would have been acquitted of the

charges but for counsel's errors is relevant, but not dispositive under the State constitutional guarantee of effective assistance of counsel").

For these reasons, it is a close question whether the Appellate Division's conclusion that Petitioner "did not show that the sentence should be set aside based on ineffective assistance of counsel" is a decision "on the merits" of Petitioner's *Strickland* claim for AEDPA purposes. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99; *see also Johnson v. Williams*, 568 U.S. 289, 301 (2013) (directing district courts to presume that a state court adjudicated a federal claim on the merits even "without expressly addressing that claim"). Petitioner did present his *Strickland* claim to the Appellate Division, and the court denied relief without explanation. It is possible that the Appellate Division's cursory reference to "ineffective assistance of counsel" in its opinion, combined with its citation to the New York state cases referenced above, is the sort of "indication . . . to the contrary" that the court relied on state law and did not reach the merits of Petitioner's federal claim. *Richter*, 562 U.S. at 99. But given that a state court's complete silence about a federal claim may nonetheless constitute "merits" review for habeas purposes, the fact that here, the Appellate Division stated that Petitioner "did not show that the sentence should be set aside based on ineffective assistance of counsel" may be sufficient. Thus, out of an abundance of caution, for purposes of its own analysis, this Court will presume

that the Appellate Division denied the merits of both the first and second prongs of Petitioner's *Strickland* claim.

**B.    Additional Review of "Unexplained" State Court Decisions**

While a federal claim raised in state court decided on the merits must always be reviewed with heightened deference, certain merits decision, like this one, require a particularized inquiry under AEDPA.  Specifically, when reviewing a state court decision that was adjudicated on the merits but without any express reasoning, a federal habeas court must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale and then presume that the unexplained decision adopted the same reasoning."  *Wilson v. Sellers*, 584 U.S. 122, 122 (2018).  If there is no related state-court decision that provides a relevant rationale, then the state court's unexplained decision receives additional deference.  *Id.* at 125.  First, the habeas court must, on its own, identify the "arguments or theories" that "could have supported[ ] the state court's decision."  *Richter*, 562 U.S. at 102.  Then, the habeas court must ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id.*

In this case, there is no related state-court decision that provides a relevant rationale; the Appellate Division provided no explanation for its conclusion that Petitioner received effective assistance of counsel at sentencing.  Therefore, the Court will consider not only whether the state court's decision was "unreasonable" under § 2254(d), but will do so under the specific framework set forth in *Richter*.

i.    *AEDPA Deference to a State Court's Determination of an Ineffective Assistance of Counsel Claim*

Where, as here, the state court has denied an ineffective assistance of counsel claim on its merits, that ruling itself receives heightened deference when a petitioner renews that claim in federal court.    As an initial matter, under *Strickland*, there is a strong "presumption of effective performance" by trial counsel. *Greiner*, 417 F.3d at 326.   Courts will "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." *Greiner*, 417 F.3d at 319 (internal quotation omitted).   And for a federal court sitting in habeas, "[w]hen the claim at issue is one for ineffective assistance of counsel . . . AEDPA review is 'doubly deferential.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen*, 563 U.S. at 190).

## C.    Whether Relief is Available Under § 2254

Because this Court has found that Petitioner did not receive effective assistance of counsel at sentencing, it must now determine whether the Appellate Division unreasonably applied *Strickland* in reaching the opposite conclusion.  *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing inquiry federal court must make under § 2254 after finding habeas petitioner suffered a constitutional violation).   Faced with a decision from the Appellate Division that provides no reason for its decision and no related reasoned state court opinion, this Court is further tasked with identifying the possible basis for the Appellate Division's decision before evaluating whether the petition should be granted under § 2254(d). *Richter*, 562 U.S. at 100.  Because the Court does not know whether the Appellate

Division concluded that Petitioner failed to establish the deficient performance prong, prejudice prong, or both prongs of *Strickland*, it considers all potential bases for that ruling, including all those hypothesized by Respondent.

i.   *Potential Bases for the Appellate Division's Decision*

Given that a reviewing court presumes trial counsel was competent, the Appellate Division may have presumed, as Respondent suggests, that trial counsel advocated sufficiently for a favorable sentence in the two bench conferences for which there is no record, and/or by coaching Petitioner to express remorse at the sentencing proceeding. *See* Appellant-Resp't's Reply, App. Div. at 11; Suppl. Opp'n to § 2254 Pet. at 36–38. According to Respondent, counsel's decision to stay silent at sentencing may have been strategic, possibly based on counsel's view that "expressions of regret and remorse are best made by the defendant personally and not by counsel on behalf of the defendant" and that Petitioner through "expressions of remorse" was "better able to convince a sentencing judge to impose a lower sentence tha[n] his attorney might have been able to." Suppl. Opp'n to § 2254 Pet. at 36–37. In other words, it may be that the Appellate Division concluded that Petitioner did not satisfy *Strickland*'s deficient-performance prong because either (1) counsel provided adequate representation through preparation for the hearing that was not captured anywhere on the record, and/or (2) there may have been a reasonable strategic basis for counsel's silence at sentencing.

The Appellate Division may instead, or additionally, have reached its decision by finding that Petitioner failed to establish he was prejudiced by counsel's

performance.  In that case, the Appellate Division would likely have concluded that the lower court had reduced Petitioner's sentence not because of mitigation evidence that could have been presented at the original sentencing proceeding, but instead – as Respondent's hypothesizes – because of an evolution of the trial judge's "temperament and judicial philosophy."  *Id.* at 37.  In other words, the Appellate Division could have found that when Petitioner was initially sentenced, "counsel or defendant himself could [not] have persuaded the court to impose any lighter [sentence] than the eighteen-year prison sentence" that the trial court imposed, even if counsel's performance had been adequate.  *Id.*  In support of that view, the Appellate Division may have been persuaded by Respondent's point that when setting aside Petitioner's sentence, the trial judge "did not state, or even suggest, that he would have been amenable at the initial sentencing proceeding to impose an even lesser sentence than the sentence that [he] imposed – which was two years less than the sentence of twenty years that the court had" originally promised. Appellant-Resp't's Reply, App. Div at 12.

The Court now considers whether either of the two possible theories identified – (1) that Petitioner failed to rebut the presumption that his counsel performed adequately, and (2) that Petitioner failed to establish prejudice because there is not even a reasonable probability that at his initial sentencing he would have received a sentence of less than eighteen years in prison had the evidence before the § 440 court been presented at that time – could support granting the Petition under § 2254.

ii. *Whether a "Fairminded Jurist[] Could Disagree" that the Appellate Division's Decision Was Contrary to or Involves an Unreasonable Application of a Supreme Court Decision or an Unreasonable Determination of the Facts in Light of the Evidence*

Under § 2254(d)(1), a petition challenging a state court decision can only be granted if the decision is "contrary to" federal law, "involved an unreasonable application" of such law, or "was based on an unreasonable determination of the facts" in light of the state court record. *Richter*, 562 U.S. at 100. A decision is "contrary" to federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 412) (alteration in original). An "unreasonable application" of federal law occurs where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08. "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (internal quotation marks and citations omitted).

A defendant's right to effective assistance of counsel at sentencing is a "clearly established" federal law for purposes of a § 2254 analysis. *See Glover,* 531 U.S. at 203–04. And "[t]o the extent that there was any doubt that *Glover* 'clearly established' that *Strickland* applied to noncapital sentencing proceedings, that doubt was erased in *Lafler v. Cooper*," where the Supreme Court "establish[ed] that there exists a right to counsel during sentencing" in noncapital cases "because any amount of [additional] jail time has Sixth Amendment significance." *Daire v. Lattimore*, 812 F.3d 766, 767 (9th Cir. 2016) (internal citations omitted).

Even after considering all potential bases that could have supported the Appellate Division's denial of relief here, this Court concludes that the state court's decision was an unreasonable application of *Strickland* and related prior decisions by the United States Supreme Court.

*First,* to the extent the Appellate Division determined that counsel may have strategically refrained from advocating for Petitioner on the record at the plea and sentencing proceedings because he advocated adequately for Petitioner in the off-the-record bench conferences that preceded those proceedings and made a strategic determination that the sum total of all sentencing advocacy at the hearing itself would be most effective if it included nothing more than a two-sentence "coached" statement by Petitioner himself expressing regret for the crime he had committed, that determination is belied by the cold record and is unreasonable. Petitioner, through the allegations in his § 440 motion and sworn affidavit supporting the same, has rebutted the "strong presumption that counsel's conduct [fell] within the

wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Whatever counsel may have said at the bench during either proceeding, it did not include his client's young age at the time of the offense, role as a father of a young child, tragic loss of his own father to gun violence, and considerable family support, as shown by the trial court's reaction to that information when the court (i) elicited some of that basic biographical information itself on the record before imposing the initial (eighteen year) sentence, *after* reviewing the PSI and *after* Petitioner and counsel had the opportunity to make their own statements yet mentioned none of that information, and (ii) learned considerably more of that compelling mitigation later during the sentencing and § 440 proceedings.  Instead, it appears trial counsel asked only what the trial court would be willing to offer to Petitioner, rushed Petitioner to accept the trial court's first offer on the spot, and then weeks later, at sentencing, made a *pro forma* request to the trial court to "come down" yet again.

Even crediting Respondent's unsupported speculation that Petitioner only made his two-sentence statement of remorse on the record at sentencing at counsel's urging, counsel's imagined advice to Petitioner to state his remorse deserves little credit.  Even if counsel did advise Petitioner to speak (and to say more than he did), there was no strategic reason whatsoever for counsel to stay silent, particularly after hearing Petitioner's statement.  This is not a case "in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *See Porter*, 558 U.S. at 41 (granting habeas relief to state prisoner whose counsel failed to present available mitigating evidence at penalty

phase such that "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability."). Nor is this a case in which further advocacy might have caused more harm than good, as might be the case where a defense attorney has reason to believe that doing so might open the door to aggravating information or might alienate a judge whose patience had worn thin. To the contrary: the record shows that the trial court was eager to hear more about the life history and circumstances of the young man who stood before it in this tragic case before imposing a lengthy prison sentence – so much so that the trial court, after the defense's woefully thin "presentation" at sentencing concluded, continued the hearing to make its own inquiry about what little of Petitioner's mitigating life history could be gleaned from the PSI before deciding how many years he would spend behind bars. And no choice needed to be made between Petitioner speaking and counsel speaking. Where, as here, a defendant is facing a sentence "equal to [his] total life span on the earth," and the trial court has discretion to sentence him to as little as five years on the sole charge to which he has pled guilty, it is indeed "devastating" for a defendant to have counsel who says nothing on his behalf. *See* ECF No. 7-2 at 40. Further, accepting that argument as a reasonable basis for the Appellate Division's denial of *Strickland* relief would require this Court not just to hypothesize that the Appellate Division made that finding, but that it did so even in the absence of any such claim by trial counsel himself. For this is not a case where trial counsel has testified or otherwise asserted that he harbored any concerns (much less objectively reasonable

ones) that led him to refrain from any pre-sentencing investigation or any advocacy on his client's behalf at the sentencing itself.  Nor has trial counsel even suggested that he foresaw any downside whatsoever to investigating and/or presenting any of the considerable mitigation now on record to that same trier of fact.

*Second*, inasmuch as the Appellate Division's decision was based on a determination that Petitioner failed to establish prejudice, that determination amounts to an unreasonable application of *Strickland* to the facts of this case. Respondent argues that Petitioner has not established that there is a reasonable probability that at his initial sentencing he could have received a prison sentence of less than eighteen years, and that the Appellate Division might reasonably have concluded as much in its unexplained decision.  Faced with the incontrovertible fact that Petitioner subsequently received a significantly lower sentence from the same judge who sentenced him originally after that judge learned only a handful of additional personal facts about him, Respondent speculates that the same information would not have moved the needle if it had been shared just a few years earlier.  Instead, Respondent theorizes that Petitioner received a reduced sentence because of potential changes to the "judge's temperament and judicial philosophy." Suppl. Opp'n to § 2254 Pet. at 37.

Nothing in the record of the plea, sentencing, and § 440 proceedings supports Respondent's theory that a potential change to the "judge's temperament" accounts for Petitioner's reduced sentence.  Instead, the record unambiguously supports a finding that, as Petitioner's state postconviction counsel argued, "the court's

willingness to offer its own plea over prosecution objection and to give Mr. Chambers a lower sentence than its original promise showed just how effective counsel could have been had he advocated more forcefully for a sentence that was closer to the co-defendants' and took account of Mr. Chambers' particular facts." Def.-Appellant's Br., App. Div. at 17.  For this same trial court originally offered a plea with a promised sentence of twenty years and then, two weeks later, after *sua sponte* inquiring about potential mitigation on the record, reduced that promised sentence by two years.  Clearly, at the time of the original sentencing, the trial court was not only willing but eager to hear mitigating evidence before deciding on an appropriate sentence.  But without the assistance of counsel, the trial court had only the PSI and a brief apology from a young defendant, who lacked the ability to independently articulate his profound feelings of shame and regret or to marshal his troubled but compelling personal history as mitigation—the job of a lawyer.  *See* ECF No. 7-4 at 2–3.

More fundamentally, there is no basis whatsoever on this record to conclude that Justice Gubbay underwent a personal transformation of "judicial temperament" that influenced his decision to vacate the original sentence and impose a modestly reduced one of fifteen years during the § 440 proceedings. Instead, the record makes clear that notwithstanding the newly presented mitigation evidence before the court, Justice Gubbay remained mindful of the serious nature of the crime for which Petitioner had accepted responsibility and the need to ensure that his punishment was commensurate with the harm caused.  *See,*

*e.g.*, ECF No. 7-2 at 81 (describing Petitioner's case as "a very, very difficult case, very disturbing underlying facts" on the record in § 440 conference); *id.* at 88 (emphasizing that "[t]his is a horrific case" of "unspeakable gun violence" and "what happened to that child, that little girl, that three-year-old should not happen to anyone ever, ever").  Justice Gubbay proceeded to appoint counsel for Petitioner and adjourned the § 440 proceedings four times before deciding whether to grant § 440 relief, giving Respondent a full and fair opportunity to investigate and respond to Petitioner's claims that trial counsel was ineffective.  Respondent's contention that this thoughtful consideration of the claims in Petitioner's *pro se* motion was rooted in Justice Gubbay's shifting personal views about sentencing in a few short years, rather than due consideration of the facts and law before him in the § 440 proceeding, is an unwarranted aspersion on the trial court's integrity.  And it is one that finds no support whatsoever in the record.

On federal habeas review, this Court approaches that task with similar gravity and even greater deference.  The Court is mindful of the danger of "equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)," and its duty to credit any "reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter*, 562 U.S. at 105.  It also recognizes that grants of relief based on ineffective assistance of counsel at sentencing are, with good reason, extremely rare.  But they are warranted in the rare case where, as here, (1) counsel's deficiencies are so apparent, (2) there is no suggestion nor credible theory of any strategic justification for counsel's omissions to which the habeas court can or

should defer, and (3) the record unequivocally establishes prejudice through the history of the state court litigation itself.

In this regard, the Seventh Circuit's application of the Supreme Court's *Strickland* precedents in a highly similar § 2254(d) context in *McMullen v. Dalton*, 83 F.4th 634 (7th Cir. 2023), is particularly instructive. In *McMullen,* the Court considered whether the state habeas court had unreasonably applied clearly established law when considering whether the petitioner had received ineffective assistance of counsel at his original sentencing after being convicted on drug charges. *Id.* Specifically, the *McMullen* Court found that, on the record before it, there was no reasonable basis for the state court to have determined that the petitioner – who had been sentenced to fifty years in prison – received effective assistance of counsel at a sentencing hearing in which his trial counsel presented virtually none of the available mitigating evidence to advocate for a lesser term. *Id.*

In *McMullen*, trial counsel had available a PSR describing McMullen's "lengthy criminal history" and alluding to, but not fully explaining, difficulties in McMullen's personal life—that his childhood was "not great," that his parents had criminal convictions, drug addictions, and had been largely absent from his life "due to abuse," that McMullen's mental health was "okay" but that he had "some concerns about depression," that he had difficulty with anger and alcohol, especially after his cousin died. *Id.* at 638. Yet McMullen's lawyer "really didn't do anything to develop any mitigation," apart from speaking to McMullen's grandmother, because he did not "think that mitigation would stack up" given McMullen's serious

charges. *Id.* at 638–639.  At sentencing, trial counsel made several arguments on the record concerning McMullen's history of abuse and responded to certain claims made by the prosecution, but presented no additional mitigation evidence to supplement what was already in the PSR. *Id.* at 639.  McMullen was sentenced to fifty years in prison, the statutory maximum. *Id.*

McMullen filed a state habeas petition alleging that his counsel's failure to "conduct a reasonable investigation of McMullen's character, background, mental status, arrange for him to be evaluated by a mental health professional, and present evidence of mitigating circumstances" constituted ineffective assistance of counsel. *Id.*  After an evidentiary hearing, the state trial court denied McMullen's habeas petition, concluding that McMullen's sentence was the result of his "increasingly troubling behavior and history" and not "the quality of the argument that his attorney made" at sentencing. *Id.* at 640.

McMullen then filed a federal habeas petition, alleging his counsel performed deficiently by failing to "conduct a reasonable investigation into [his] background," "present sufficient evidence of mitigating circumstances at sentencing" and "investigate [his] mental health or have him evaluated by a mental health professional." *Id.* at 643.  The District Court applied AEDPA's deferential standard of review to both prongs of McMullen's *Strickland* claim and affirmed the state court's denial of McMullen's habeas petition. *Id.*

On appeal from the denial of habeas relief, the Seventh Circuit reversed and remanded.  The Seventh Circuit applied the standard set forth in *Wiggins v. Smith*,

539 U.S. 510, 523 (2003), for evaluating whether an attorney's investigation and presentation of mitigating evidence at sentencing comports with the Sixth Amendment. *McMullen*, 83 F.4th at 643. Applying AEDPA deference, the Court found that, as in *Wiggins*, counsel's failure to investigate McMullen's background, particularly given the red flags in the PSR, was not a "reasonable professional judgment" and that the state court unreasonably found otherwise. *Id.* at 644. Under clearly established Supreme Court precedent, given the decades in prison his client was facing, "[counsel's] investigation should have gone beyond just review and use of the PSR, and discussion of McMullen with a knowledgeable relative." *Id.* at 645. The Court further found that McMullen's counsel performed deficiently by failing to present available evidence of mitigating circumstances to the sentencing court, which "was a function of the scope of [counsel's] investigation before sentencing." *Id.*

The Seventh Circuit also concluded that McMullen was prejudiced by his counsel's performance – *i.e.*, that there was at least a reasonable probability that McMullen would have received a lesser term in prison had counsel done a minimally adequate job of investigating and presenting available mitigating evidence – and that the state court had unreasonably applied *Strickland* when it concluded otherwise. *Id.* at 646. It then remanded the case for a limited evidentiary hearing pursuant to § 2254(e) because the record from the state habeas proceeding did not make clear whether McMullen's counsel had "strategic reasons

for the limits of his investigation . . . and the presentation of mitigating circumstances." *Id.* at 648.[15]

In the instant case, counsel's performance is equally – if not more – deficient under the standards of *Strickland* and *Wiggins*. In *McMullen,* the state court record showed that trial counsel had made some, albeit a limited, effort to investigate his client's background (including by interviewing McMullen's grandmother prior to the sentencing hearing), yet the Seventh Circuit nonetheless found counsel's efforts to be plainly deficient. Even that minimal pre-sentence advocacy is absent here. That trial counsel had not articulated even basic biographical facts about Petitioner to the trial court strongly suggests that counsel did not, himself, learn basic and readily available facts about the trauma and obstacles his client faced in his youth, or, just as concerningly, did not make any effort to present them even when the trial court gave him ample opportunity to do so *and* demonstrated its own interest in learning more about Petitioner's history before imposing sentence. Further, trial counsel did not even marshal information already documented in the PSI report to advocate for Petitioner – the least a lawyer can do at a sentencing proceeding, an act that requires no preparation by counsel and little more than reading aloud. Even under the highly deferential standard of

---

[15]  Neither party in the instant case has asked for additional factual development, and Respondent has not disputed Petitioner's claim that this Court is bound by the state court record. This Court agrees, particularly since Respondent was given repeated opportunities by the trial court to develop the record by, for example, presenting an affidavit and/or hearing testimony from trial counsel regarding possible strategic bases for his conduct prior to and at sentencing, but offered none.

review that governs this Court's analysis, trial counsel's performance was deficient, and the state court had no reasonable basis to find that it comported with the Supreme Court's established precedents. *See also Thornell v. Jones*, No. 22-982, 2024 WL 2751215, at *10 (U.S. May 30, 2024) (noting that the Supreme Court has found habeas relief appropriate under *Strickland* in numerous cases where "defense counsel introduced little, if any, mitigating evidence at the original sentencing"); *Lopez v. Atty. Gen. for Nev.*, 845 Fed. Appx. 549 (9th Cir. 2021) (affirming habeas grant under §2254 based on counsel's failure to present mitigating evidence at sentencing from a psychologist who evaluated petitioner and prepared a report concerning abuse suffered by petitioner).

This is also the rare case where incontrovertible proof establishes prejudice. The same judge sentencing the same defendant for the same crime assigned that defendant a significantly lower prison sentence based on mitigating facts that could have been presented with almost no effort at the original sentencing. If "any amount of [additional] jail time has Sixth Amendment significance," *Lafler*, 566 U.S. at 165, then the three additional years in prison that Petitioner faces as a result of counsel's deficient performance readily meets that threshold. Here, the "likelihood of a different result" with constitutionally adequate representation is not merely "substantial," it is certain. *Richter,* 562 U.S. at 111–12.

For the foregoing reasons, the Court concludes that Petitioner's constitutional right to effective assistance of counsel at sentencing was violated, and that this is the rare case in which a petitioner has cleared the high bar to relief set by § 2254(d).

## VI.   Petitioner's Excessive Sentence Claim

Petitioner also argued that his sentence is excessive in light of his youth at the time of the crime and his sincere remorse, and that his sentence is unlawfully disparate to that of his codefendants, who received eight and twelve years of imprisonment respectively. Pro Se § 2254 Pet. at 7.   Petitioner contends he is thereby entitled to habeas relief on this basis.  *Id*.  His argument on this score is unavailing.

It is well settled that an excessive sentence claim, such as Petitioner's, does not present a federal constitutional issue when the received sentence "is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Taylor v. Connelly*, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014).   In other words, habeas relief on this basis necessarily turns on whether Petitioner's sentence for each crime falls within the prescribed sentencing range under state law. Because Petitioner's eighteen-year sentence for attempted murder and assault in the second degree is permitted by state law, his sentence does not present a federal constitutional issue.  Therefore, Petitioner's excessive sentence claim is denied.

## CONCLUSION

For the reasons outlined herein, Petitioner's habeas application is GRANTED in part and DENIED in part.

Petitioner's claim for relief based on ineffective assistance of counsel at sentencing is granted.  This matter is remanded to the Supreme Court of Kings County, New York for resentencing in a manner that "restores [Petitioner] to the circumstances that would have existed had there been no constitutional error."

*United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000).  Within ninety days of this Order, the trial court shall either (a) re-impose the fifteen-year sentence issued by the § 440 court as a remedy for the constitutional violation, or (b) resentence Petitioner in a constitutionally permissible manner.

Petitioner's challenges to his conviction, and to his sentence as excessive, are denied.  A certificate of appealability will not issue, because Petitioner has not made a substantial showing of the denial of a constitutional right with respect to his conviction or to the relative length of his sentence (other than on grounds of ineffective assistance of counsel).  *See* 28 U.S.C. § 2253.

Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal taken from these portions of its decision and order would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal.  *Coppedge v. United States*, 369 U.S. 483, 444–45 (1962).


  /s/ NRM
NINA R. MORRISON
United States District Judge


Date:  June 3, 2024
          Brooklyn, New York